Booth, Chief Justice,
delivered the opinion of the court: This Indian case now before the court under the provisions of the special jurisdictional act appearing in Finding 1, is predicated upon an alleged failure of the Government to comply with a treaty obligation and an act of Congress respecting the education of the children of the Sioux Tribe of Indians between the ages of six and sixteen years.
The Sioux Tribe of Indians was one, if not the largest in population, of what is commonly designated as “Plains Indians.” The Sioux Tribe is a generic designation of eight tribes then residing on reservations in the now States of North Dakota, South Dakota, Nebraska, and Montana. The treaty of April 29, 1868, about which much more must be said, delimited for the various tribes an extensive reservation embracing lands in the States mentioned and extending over to portions of the States of Wyoming, Kansas, Iowa, and Minnesota.
Article YII of the Treaty of April 29,1868 (15 Stat. 635), reads as follows:
In order to insure the civilization of the Indians entering into this Treaty, the necessity of education is admitted, especially of such of them as are or may be settled on said agricultural reservations, and they therefore pledge themselves to compel their children, male and female, between the ages of six and sixteen years, to attend school; and it is hereby made the duty of the agent for said Indians to see that this stipulation is strictly complied with; and the United States agrees that for every thirty children between said ages who can be induced or compelled to attend school, a house shall be provided and a teacher competent to teach the elementary branches of an English education shall be *26 furnished, who will reside among said Indians, and faithfully discharge luis or her duties as a teacher. The provisions of this Article to continue for not less than twenty years.
Section 17 of the act of March 2,1889 (25 Stat. 888), is in the following language:
That it is hereby enacted that the seventh article of the said treaty of April twenty-ninth, eighteen hundred and sixty-eight, securing to said Indians the benefits of education, subject to such modifications as Congress shall deem most effective to .secure to said Indians equivalent benefits of such education, shall continue in force for twenty years from and after the time this act shall take effect; * * *.
The plaintiffs claim that the Government did not for the period from 1871 to March 2, 1889, provide a schoolhouse for every thirty (30) Indian children between the ages of six and sixteen years, nor was a teacher provided to teach the children “the elementary branches of an English education.” The plaintiffs also claim that notwithstanding the enactment of the act of March 2, 1889, the Government continued to' disregard its obligations under the treaty of 1868 for the extended period of twenty years provided in said act, and hence the Indian plaintiffs are entitled to a judgment for the total sum of $18,090,365.46 damages. This sum is arrived at by stating the plaintiffs’ damages at $24,077,170 and deducting therefrom the sum of $5,986,804.54 admittedly expended by the Government during the forty-year period, i. e., from 1871 to 1910, for the education of the Indian children.
To sustain the case, the plaintiffs sedulously insist upon various contentions asserted as established. The record establishes that for a long period of time the Government did not strictly observe the provisions of the seventh article of the treaty of 1868 or Section 16 of the act of 1889 with respect to furnishing the educational facilities provided for therein. If this fact alone supplied the determinative issue and of itself created a monetary liability the case would be one of easy solution.
The governmental purpose to be accomplished by entering into the treaty is manifest from its express provisions. We *27 are again called upon to repeat what has been for so long recognized and so many times stated, that the Government was treating with then uncivilized Indian tribes occupying a vast extent of landed territory which the Government knew it must acquire in part or face the inevitable conflict between the Indians and the white settlers. The governmental policy was firmly established. Its efforts were to be exerted in an attempt to civilize the Indians, teach them agriculture, and of course provide for their children the facilities of an elementary English education, a most important element of its policy.
Confining the discussion to the one question of education, how was it to be brought about under the provisions of Article YII of the Treaty of 1868 ? The Indians were first obligated to do certain things before the governmental obligation became effective. First, they expressly pledged “themselves to compel their children, male and female, between the ages of six and sixteen years, to attend school.” The verb “compel” as used in the treaty connotes positive action, and “induce” signifies persuasion. Obviously the Government was aware of the relationship existing between Indian parents and their children with respect to the latter’s unwillingness to attend schools.
The treaty was not intended to obligate the Government to simply erect schoolhouses and employ teachers. It was not a unilateral contract. It exemplifies the experimental nature of the undertaking and imposes mutual obligations upon the parties. The benefits to accrue were not wholly material. The objects to be accomplished possessed a much wider significance. The Indian parent was to be taught to appreciate the value of an education to his child, and the children the .advantage of the same in their contacts with the Whites now rapidly coming into Indian habitations and Indian lands.
The plaintiffs say that the Government is at fault if a sufficient number of Indian children could not be compelled or induced to attend available Indian schools, because the seventh article of the treaty of 1868 “made it the duty of the agent for said Indians to see that this stipulation is strictly complied with.” Again it is contended that the Govern *28 ment’s failure to adopt the mandatory principles of compulsory education places it in a position where no benefit may accrue to a wrongdoer.
The contention is, we think, without merit. The Indian parents pledged themselves to compel attendance. The parents, not an Indian agent, possessed the authority to enforce obedience. True, the agent could induce attendance, but for him to seek to compel, as some of them did, was but to invite the demonstration of serious hostility, which actually occurred. Aside from this, however, the duty mentioned was to see to it that, when the status quo mentioned in the treaty obtained, the treaty provisions with respect to schoolhouses and teachers would be strictly adhered to. The burden of proof rests upon the plaintiffs to sustain their case.
The plaintiffs cite the record as one consistently overwhelming in establishing not only the willingness of the parents to compel their children to attend school, but also their persistent complaints over the absence of schoolhouses and teachers, and their protests against the failure of the Government to observe Article YII of the treaty of April 29, 1868.
The record with regard to the above contention is intertwined in so many of its aspects with the evidence introduced to establish the number of Indian children of school age under the provisions of the treaty of 1868 that a discussion of one involves the other, the plaintiffs of course conceding that the burden of proof rests upon them to prove the number of Indian children involved, the cost of their education, and the extent of the Government’s defaults.
The plaintiffs concede that but one available method exists for ascertaining the number of Indian children of the school age whom the Government was obligated to educate under the treaty, and that is to first ascertain the yearly average number of all the tribes of the Sioux race entitled to treaty benefits and apply to this total tribal population a per cen-tum figure which will disclose the number thereof who were children of the age set forth in the treaty.
By this process of computation the plaintiffs estimate the average number of Sioux Indians entitled to benefits under the treaty of 1868, i. e., from 1871 to 1910, a period of forty *29 years, at 26,287. In order to establish the number of school children entitled to school facilities under the treaty the plaintiffs resort to the census enumeration of the Sioux Indian population for the years 1881 to 1910, inclusive, and the census enumeration of school children of treaty age for the same period of time, arriving at what is claimed to be a correct ratio of school children to the total population. Upon the figures thus employed the school children constituted 22.05% of the total Indian population for this period, and this percentage basis is applied to the entire forty-year period, viz, an annual school population of 5,785 children under the treaty.
It may be conceded that the method resorted to is the only one available for the purposes of the case. The difficulties pertaining to the establishment of the computations of record are apparent, a situation brought about by the nature of the controversy, involving as it does an extremely large Indian population with separate habitats, constrained in their habits, customs, and tribal life by the long-established traditions of their race, constantly suspicious and distrustful of the Whites, reluctant to ascribe to governmental policies, and extremely slow in acquiring the mode of life designed for their peace and civilization.
The issue is, may this court award the plaintiffs a judgment upon the record? Without going into minute detail, and condensing historical facts as much as possible, it is indisputably certain that prior to 1868 the Sioux Tribe of Indians, so far as its certain population is concerned, did not themselves nor did anyone else know it. These Indians roamed over a vast extent of territory. Many of the tribes were designated by different names, such as the Ogalalas, Yanktons, Hunkpapa, etc., etc., ruled by separate chiefs, and occupying territorial possessions distant from each other. The most that can be said is that Sioux Indians were numerous and their population estimated.
The discovery of gold in Montana in the year 1861 inaugurated a tide of emigration from the east to the west. The route of travel taken was over what is known as the Bozeman or Powder Biver Trail, and this route traversed in part the territory over which the Indians hunted and procured *30 buffalo and other species of wild game for a livelihood. This, and the establishment of military posts within the domain, generated intense hostility towards the Whites and the Government, a situation so acute as to lead to open warfare costing the lives of many Indians and soldiers of the United States. The so-called Powder River War beginning in 1866 was the event which led finally to the treaty of April 29, 1868.
It is therefore obvious that up to this date an authenticated census of Sioux Indians was impossible. The treaty of April 29, 1868, sufra, was designed in a great part at least as one of peace and amity. It was consummated upon the heels of an armed conflict between the parties thereto, and at a time when the issue of population was not theretofore of primary importance. We say this advisedly, for a paragraph was inserted in Article X of the treaty imposing upon the Indian agent the duty of making a census of the Indian parties to the treaty.
What then happened subsequent to 1868 with respect to a reliable census of the Indians? The transition from a congenital wild life to one of the quiet pursuit of agriculture is not an overnight process. Indian treaties very frequently gave rise to hostilities, and the treaty of 1868 was not an exception. It is manifestly impossible to complete an enrollment of tribal Indians in the absence of some sort of a cohesive segregation enabling the census taker to count them. It may not be accomplished with speed in cases where an unnumbered population of Indians is brought into treaty relations with the Government and the treaty itself creates an undertaking of magnitude and delicacy in the adjustment and administration of Indian rights thereunder. The Indian officials were dealing with an unlettered and uncivilized race of people.
Unfortunately, the Government assented to Article XYI of the treaty of 1868 — perhaps it prepared and suggested it. This article accorded hunting rights and privileges to the Sioux in what is designated as “unceded territory.” It was a vast extent of territory outside the large reservation delimited to the- tribe in the treaty. The Government agreed to prevent white men from settling upon or occupy *31 ing any of said lands. Government military posts were to be withdrawn, a road leading to Montana was to be closed, and no one, save the Sioux, was to be permitted to pass through the domain without the Indians’ consent.
The above concession and confirmed privilege granted the Indians fell short of its intended purpose and served to a very large extent to continue the nomadic habits of innumerable members of the tribe. This large area of land, at the time supplying buffalo and wild game to the Indians, attracted an indefinite number of Indians to it, and there they spent their time, frequently never reporting to any agency until the rigors of winter forestalled their continued occupancy of the same and forced them into various agencies. During the continuance of this condition an authentic census of the Indians was impossible.
The “unceded lands” brought on the war of 1876-1877 when the tribe under Sitting Bull in open hostilities defeated in certain engagements the troops of the Government, resulting in the death of General Custer and the men under his command, a contest brought to a close when Sitting Bull and a large number of his followers fled to Canada, from which place they did not return until 1881. Bed Cloud, the belligerent chief and warrior of the Ogalala Sioux, resisted efforts to locate permanently on the treaty reservation until 1878. The Brides under Spotted Tail were equally as reluctant to give up their nomadic habits and accept the benefits of the treaty and they did not do so until 1878 (20' Stat. 206, 232).
From what has been said it must not be assumed that all the bands or tribes of Sioux Indians were hostile to Governmental authority and refused to settle upon the reservations provided for them in the treaty of 1868. The record discloses that several of the tribes were peaceably removed to their reservations and were willing and anxious to accept the benefits of the treaty and cooperate with the Indian agents in its administration.
Notwithstanding this fact, the reports of the Indian agents clearly disclose that the pronounced disaffection of the numerous Indians for the Government and their open hostility towards it resulted in a measure of unrest and at *32 times open hostility towards the peaceable tribes on the part of the warriors, who not only solicited recruits from the peaceable Indians but upon some occasions resorted to the plunder and destruction of their property as a manifestation of their displeasure over their willingness to remain in amity with the Government.
Coincident with the execution of the treaty of 1868 and for many years thereafter, the great and powerful Sioux Nation was seriously divided. Innumerable Indians declined to reside upon the reservation with any degree of permanency. A large and powerful group led by able and cunning warriors resented the inroads of the Whites, and the building of the Union Pacific Bailroad angered them. Treachery and deceit were charged against the Government. Indian wars and Indian depredations upon Government and Indian property characterized the era.
With this and the added fact that numerous Indians were constantly traversing the unceded lands in pursuit of buffalo, as well as the interchange of membership from one tribe to another, it is, we think, an incontrovertible fact that no census of the Indians could possibly have been taken upon any other basis than a mere estimate. True, in some few instances the Indian agents were able to count the Indians receiving supplies at their agencies, but a large portion of the population, turbulent, hostile and nomadic, did not submit to being counted.
The character and disposition of the aboriginal Indians may not be ignored in Indian litigation. As a matter of fact, this record discloses that the Indian Tribe was prone to exaggerate its numbers, moved to do so by a conviction that numbers brought fear to the Government’s soldiers in the event of conflict, and likewise increased the quota of their supplies under Indian treaties.
The extinguishment of the Indians’ hunting grounds, the passing to white settlers of the wide expanses over which they formerly roamed, culminated finally in the necessity of seeking food from other sources and that one great source was the Government. They finally submitted to governmental authority, came in large numbers to the delimited reservation, resumed amicable relationship with the *33 Government, and, from this point on, an authentic census of the Indians with few exceptions appears. Many Indian cases in this court reflect the multitude of difficulties encountered in making an enrollment of the Indians.
The court readily approves the established legal principle governing the assessment of damages in cases of a breach of contract set forth in the many cases cited in plaintiffs’ able briefs. It is not essential to review them; the decisions do not depart from long-established precedents. The issue of allowable damages does not turn alone upon the one fact that the total number of Sioux Indians for the period of time claimed is no more than an estimate nor upon the failure of the plaintiffs to prove the population with absolute certainty. Damages must be proven with reasonable certainty. This court is without jurisdiction to award nominal damages. Marion & Rye Valley Railway Co. v. United States, 270 U. S. 280; Perry v. United States, 294 U. S. 330. The plaintiffs to recover must establish a pecuniary loss, one capable of being reduced to dollars and cents with reasonable certainty.
An estimate to form the basis for a money judgment must of necessity be predicated upon fundamental facts which import to it a degree of verity and reasonableness. Its origin and development must disclose to a convincing extent that the figures given do not involve the court in indulging in conjecture and speculation as to the true or possible situation in the premises. If the estimate generates acute controversy and contradiction, if the sources from which it comes denote its opinion character and disclose upon its face the impossibility of reliance upon its verity because of conditions obtaining at the time the figures were given, there is manifestly imposed upon the court the exercise of conjecture and speculation to accept the same as reflecting a reasonable degree of accuracy.
This record abounds with variances in agency reports upon which the plaintiffs must and do rely. The substantial variations which appear therein clearly indicate that the report itself was based upon a mere estimate. An example taken from some of them indexes the fact, viz, “The Indians who look to this agency (Cheyenne River) for subsistence *34 consist of portions of tbe Two Kettle, Sans Arc, and Minué,-conjoux bands of Sioux and number from 5,000 to 6,000.” This report was made in 1874, six years after the execution of the treaty.
In 1871 the Superintendent of Indian Affairs for Montana reported, “Of these Teton Sioux, there are probably 1,000 lodges, under the control of Sitting Bull.” The agency at Fort Peck reports from 6,000 to 7,000 Indians in 1877. We are dealing in this case with a large number of tribal Indians living in a state of incohesiveness, innumerable members hostile to the Government with no intention or desire to disclose their numerical strength, forcing the Indian agents to speculate — except in a few instances — as to how many Indians made up a certain group, and by their conduct creating a degree of confusion and uncertainty that continued until at least the early eighties. Blachfeet Indian case, 81 C. Cls. 101.
The inability of the plaintiffs to establish with reasonable certainty the population of the tribe in the early period of the existence of the treaty of 1868, is not the single impediment preventing plaintiffs’ recovery. If we could accept the average total population as established, there still remains the process employed to establish the number of school children coming within the treaty provisions for whom schoolhouses and teachers were to be furnished.
The plaintiffs are asking damages for a failure upon the part of the Government to furnish educational facilities for “every thirty children” between the ages of six and sixteen who may be compelled or induced to attend school. The annual number of children fixed by plaintiffs at 5,785 is made inflexible by the computation, and while it is determined upon a census of the Indians and school children for a period of time when peaceable relations prevailed between the Government and the Indians, a period of eight years, i. e., 1881 to 1886, inclusive, and 1888 to 1891, it does not follow in the absence of identical conditions and surroundings that this fixed number of children obtained in the early thirty years of the treaty’s existence.
*35 The court must be able from the record to ascertain the extent of the Government’s default with respect to educational facilities through the entire forty years, and it is, in our view, impossible to rest a judgment involving as in this case the number of Indian children eligible under the treaty upon the percentage basis offered, ascertained at a time when the serious impediments to education did not exist and the difficulties incident to complying with the treaty had largely disappeared.
The Government was under no treaty obligations to furnish schoolhouses and teachers if pupils could not be compelled or induced to attend school. Assuredly the treaty provisions were not intended to obligate the Government to do a useless thing, and from this record it is impossible to find that, in the early history of the treaty relationships obtaining, anything like 5,785 Indian children of the designated ages were annually available for schooling.
In the Mills Lac Indian case, 229 U. S. 498, 500, the Supreme Court said:
The jurisdictional act makes no admission of liability, or of any ground of liability, on the part of the Government, but merely provides a forum for the adjudication of the claim according to applicable legal principles. Nor does it contemplate that recovery may be founded upon any merely moral obligation, not expressed in pertinent treaties or statutes, or upon any interpretation of either that fails to give effect to their plain import, because of any supposed injustice to the Indians. United States v. Old Settlers, 148 U. S. 427, 469; United States v. Choctaw, &c., Nations, 179 U. S. 494, 735 [sic]; Sac and Fox Indians, 220 U. S. 481, 489.
The court cannot depart from the above established precedent because the difficulties incident to proving damages fall upon the plaintiffs. If we are convinced that the established facts lead inevitably into the realm of conjecture and speculation we are powerless to hazard a finding that a loss, definite and fixed, was suffered because of an alleged default of the Government in observing an article of a treaty. Our opinion is not, as previously observed, founded upon the simple fact that computations involve *36 estimates. It rests upon the broader legal foundation that the contemporaneous history of the transaction does not admit of establishing that degree of certainty essential to warrant a money judgment for the damages claimed.
The plaintiffs seek to justify the proffered proofs regarding damages suffered, on the ground that the necessity of resorting thereto is chargeable exclusively to the Government’s failure to observe its treaty obligations and make a census of the Indian population and eligible school children and its conspicuous guilt in exciting hostilities and Indian wars which resulted in turbulence and prevented the doing of duties imposed by the treaty provisions upon the Government. In other words, under the law the Government is precluded from taking advantage of its own wrongs.
There is no evidence of real probative value in this record that would warrant the court in finding that the Government was responsible for the Indian wars which characterized certain periods of the treaty’s existence. It is true that certain reports of Indian agents recite the causes which the Indians said incited war and some historians of the northwest, writing long after the event, ascribe failure upon the part of the Government to observe treaty obligations as responsible for outbreaks. This, however, is a historical controversy which this record does not settle.
What the record does establish is the fact that in 1868 and for many years thereafter the unsettled and chaotic condition of the Sioux Tribe of Indians was such that strict compliance with the treaty of 1868 was an impossibility. The almost insurmountable difficulties which attended the Government’s policy of Indian civilization extant in 1868 was present in its contacts with the Sioux Tribe. A large body of Sioux Indians under the leadership of resourceful and intrepid chiefs intent on the settlement of grievances by resort to arms, occasioned a segregation of the tribe to such an extent and under circumstances which precluded the ascertainment of numbers with such a degree of reasonable certainty as warrants a judgment in this case.
Again it is insisted that the damage suffered in this case was the wrong done the Sioux Indians as a tribe and not *37 alone the children of the tribe. The Sionx Tribe, it is said, ceded a valuable landed estate to the Government as part consideration for the educational facilities set forth in Article VII of the treaty of 1868. Article VII of the treaty was designed to be of mutual benefit. The Government was as much interested as the Indian parents in the education of the Indian children to bring about their civilization.
Is it as a legal proposition possible to ascertain the damages resulting from a failure to receive the elementary education provided for in the treaty? Is the amount allowable to be predicated upon the expense of educating the children? Do not other important factors enter into the issue? The plaintiffs cite statistics compiled in 1930, twenty years after the expiration of the treaty period, when surely schools were available for Indian children in the locality given, wherein the percentage of illiteracy between native-born Whites and Indians is “native Whites (native parentage), North and South Dakota 0.3; Indians, 20.7 and 16.2.” Obviously some factor other than available educational facilities must have contributed to this wide divergence.
The ones who suffered substantial damages were the children themselves. Granting that the loss of an English education in its elementary branches might handicap one in Ms transition from a tribal Indian to the habits, customs, and mode of life of the Whites, how may it be reduced to dollars and cents? Juvenile education might and probably would have had a degree of civilizing influence on the tribe as a whole, but again the measuring of damages, making restitution for an alleged loss in money, is one which in itself resists calculation.
In reaching a conclusion that the failure of the Indians to procure schoolhouses and teachers in the proportion provided for in the treaty occasioned the tribe to be damaged in a huge sum of money, we must entertain too many problematical factors, speculate upon non-proven consequences, and give monetary value to a subject matter that does not lend itself to be valued upon such a basis. This court has had a case quite similar to the present one. *38 Duwamish Indians v. United States, 79 C. Cls. 530, certiorari denied 295 U. S. 755. Quoting from that case, we said (pp. 587-588) :
We search the record in vain for any accurate estimate of the number of persons eligible and willing to attend the schools. In fact, there is some testimony that the parent Indians did not encourage their children to attend. The money value to be placed upon the extent to which the absence of schools impeded the civilization and intellectual development of the tribes must of necessity rest in conjecture without any substantial basis upon which to rest it. The real sufferers are the children of the Indians living in 1859 to 1879; the adults of this generation now living would recoup but a small sum, and the generation who came afterwards the larger part, when as a matter of fact the later generation was generously offered the advantages of education. There is no evidence in the record that the plaintiffs sent their children to other schools and thereby incurred expense. No proof is adduced that funds were expended in building schoolhouses or employing teachers to conduct schools. All the record discloses is as stated. The right which the Indian children lost, deplorable as it may be, was seemingly an intangible one, the right to an education denied them not only by the Government’s failure but by the Indians’ inability to supply it. This right we think is incapable of being estimated in dollars and cents. It is incontrovertible — Indian history sustains the statement — that in early times the Indian tribes were in no sense partial to schools upon their reservations. Their establishment was a feature of governmental policy, and while in this instance the Government signally failed to observe it, the court is powerless to award a money judgment for such failure, in the complete absence of a substantial basis of fact upon which to predicate it.
A number of cases, both Federal and State, are .relied upon by plaintiffs to establish the rule that one party to a bilateral contract who has defaulted in the performance of his obligations may not escape liability for such a default because a perfect measure of damages cannot be established. We will not review the cases, for they do not depart from long established rules of contract law and have been decided *39 attending each transaction.
It has long been the law that damages may be recovered in cases where a bilateral contract has been breached “even if they cannot be calculated with absolute exactness”, but, so far as we have been able to ascertain, the courts have not abandoned the rule that in order to' recover damages in cases of the character of the instant case, the plaintiff must prove a reasonable basis for the computations relied upon. The proofs must establish facts which convince the court that the computations, essentially hypothetical in their nature, exclude speculation and conjecture and bear a direct relationship to the amount of damages which should be awarded. “All that the law requires is that such damages be allowed as in the judgment of fair men directly and naturally resulted from the injury for which suit is brought.”
Tested by the above rules of law, how may this court hold that the Sioux Tribe of Indians lost a treaty right of the reasonable value of more than eighteen million dollars when the sum claimed is predicated exclusively upon an alleged failure to extend the benefits of a limited education to an uncertain number of juvenile Indians for a limiter! number of years who will not be reimbursed for such a loss in the event of a judgment in favor of the tribe ?
A treaty with tribal Indians undoubtedly creates recip-local obligations. When the Congress accords the tribe the right to sue thereon and the court is called upon to adjudicate the case, we cannot disregard the conditions obtaining when the treaty was made nor the fundamental intent and purpose of the parties in entering into it, giving of course to the tribal Indians the benefits to which they are entitled when an “unlettered and untutored nation of people” is agreeing with an advanced and civilized race.
It is impossible under certain established conditions, such as confront us in this case, to determine it upon the precise principle contended for by the plaintiffs wherein an express contract involving a stated form of work or labor to be performed, or personal services to be rendered, is breached. *40 An Indian treaty is of a different character. The treaty of 1868 exemplifies what we mean, and came into being at a time when the Indians had not attained a high degree of civilization. It was a heroic task to induce them to surrender the vast domain over which they had roamed and settle down to agricultural pursuits.
Innumerable Indian cases clearly demonstrate — none in a more pronounced way than this one — that it exacts a long period of time to translate tribal Indians into reservation ones, to bring home to them the advantages of education and civilization, and overcome a native and natural hostility of the tribe towards the Whites whom they regard as trespassers upon their lands. In this case it required thirteen years to bring about peace with Sitting Bull and his numerous followers.
In 1873, five years after the date of the treaty, the Commissioner of Indian Affairs was recommending the establishment of military posts at each of the agencies to enforce respect for their authority and enable the agm; be conducted, and we think it is established by the great preponderance of evidence that it was not until 1881 or thereabouts that the Sioux Tribe as a whole manifested a disposition and intent to inhabit the treaty reservations and embrace the treaty provisions looking towards their care and civilization.
Subsequent to the above date the Indians with commendable zeal turned their attention in a much greater degree to education of Indian children. Nevertheless in 1891 (26 Stat. 1014) we find Congress in the annual Indian bill inserting this provision “* * * the Commissioner of Indian Affairs, subject to the direction of the Secretary of the Interior, is hereby authorized and directed to make and enforce by proper means such rules and regulations as will secure the attendance of Indian children of suitable age and health at schools established and maintained for their benefit”, and thereafter the Commissioner did promulgate ten distinct regulations designed to properly administer the statutory provisions. The regulations were general and applied to all Indians, on or off reservations.
*41 From 1881 to 1910 the Indian schools on the Sioux Beser-vation increased substantially in both attendance and capacity and during the treaty period as extended by the act of 1889 the Government expended the total sum of $7,797,758.83 for the education of the children of the Sioux Tribe. With these established facts before us we cannot with any sustainable degree of reasonableness determine, if otherwise allowable, either the probable number of school children of treaty age annually eligible under the educational provisions of the treaty or compliance by the tribe as a whole with the obligations cast upon it with respect to the same. The existence of a logical basis for the computations insisted upon does not exist. As a matter of fact, we believe the Government furnished in the early history of the treaty school facilities in excess of the demand for them from the Indians themselves.
Plaintiffs’ petition will be dismissed. It is so ordered.
- Whaley, Judge; Williams, Judge; Littleton, Judge; i , f'lnia X'lJ^dge, concur. . fr+