MaddeN, Judge,
delivered the opinion of the court:
Plaintiff is here under a special jurisdictional act of June 30, 1920 (41 Stat. 738), authorizing the Sioux Tribe of Indians or any band of the tribe to sue the United States for any amount due “ * * * under any treaties, agreements, or laws of Congress, or for the misappropriation of any of the funds or lands of said tribe or band or bands thereof, or for the failure of the United States to pay said tribe any money • or other property due * * The act waives the statute of limitations.
The substance of plaintiff’s claim is that it, as one of the several bands of the Sioux, owned an interest in common with the rest of the Sioux, in a large area of land described (see finding 3) in the treaty of Fort Laramie of 1851 and lying within the present boundaries of North Dakota, South Dakota, Nebraska, Wyoming, and Montana; that the treaty of 1851 confirmed the ownership of the Sioux of that land; that by a treaty of April 29, 1868 (15 Stat. 635, 2 Kappler 770) and an agreement of 1877 (19 Stat. 254, 1 Kappler 168), certain bands of the Sioux, not including plaintiff, relinquished to the United States their interest in a portion of that land lying west of the Missouri Kiver; that by an act of Congress of March 2, 1889 (25 Stat. 888, 1 Kappler 328, 336), the United States took-the rest of the lands covered by the treaty of 1851, giving to the bands of the Sioux other than plaintiff separate reservations; that plaintiff was not a party to the treaty of 1868 nor the agreement of 1876 and did not relinquish its interest in the land; that nevertheless the United States took the land, including plaintiff’s interest, and appropriated it to its own use; that as a result thereof, and of the jurisdictional act of 1920, plaintiff is entitled to recover the value of that interest.
The defense of the.United States rests on two grounds; first, that plaintiff and the rest of the Sioux did not have such an interest in the lands in question as to entitle them to compensation upon the taking of the lands by the United *63 States; second, that whatever interest plaintiff band had as a consequence of the treaty of 1851 was relinquished by it to the United States by a treaty of 1858 made between plaintiff band and the defendant. We consider first the effect of that treaty.
The pertinent provisions of the treaty- of April 19, 185.8 (11 Stat. 743) are as follows:.
Article I. The said chiefs and delegates of said tribe of Indians do hereby cede and relinquish to the United States all the lands now owned, possesed, or claimed by them, wherever situated, except four hundred thousands acres' thereof, situated .and described as follows, to wit:
[Here follows a description of the four hundred thousand acres which was intended as a permanent reservation for plaintiff band.]
They, also, hereby relinquish and abandon all' claims- and complaints about or growing out of any and all treaties heretofore made by them or other Indians, ex-, cept their annuity rights under,the treaty of Laramie, of September 17, A. D. 1851.
■ Article II. The land so ceded and relinquished by the said chiefs and delegates of the said tribe of Yanc-tons is and shall be known and described as follows, to wit—
[Here follows a description of a tract of land lying between the Big Sioux and the Misouri Elvers, which land immediately adjoined the four hundred thousand acre tract excepted from the relinquishment and cession of Article I, and which land, together with the land so excepted, had been the territory particularly occupied by plaintiff band.]
And they also cede and relinquish to the United States all their right and title to and in all the islands of the Missouri Eiver, from the mouth of the Big Sioux to the mouth of the Medicine Knoll Eiver.
And the said chiefs and delegates hereby stipulate and agree that all the lands embraced in said- limits are their, own, and that they have full and exclusive right to cede and relinquish the same to the United States.
Aeticle XIV. The said Yanctóns do hereby' fully acquit and release the United States from all demands' against them on the part of said tribe, or any individual *64 thereof, except the before-mentioned right of the Yanctons to receive an annuity under said treaty of Laramie, and except, also, such as are herein stipulated and provided for.
It is plain, and plaintiif concedes, that the language of Article I, standing alone, would have relinquished plaintiff’s here asserted undivided interest in the large tract which was the subject of the treaty of 1851. Whether regarded as an admitted ownership or as a claim, it was included in the cession and release. Besides, the specific reference to the treaty of 1851, saving its annuity rights under that treaty, was an indication that it had in mind, when making the treaty of 1858, its rights under the treaty of 1851, and was expressly saving such of those rights as it did not intend to release. The language of Article XIV was also suitable for relinquishing plaintiff’s claim to the land in question, especially if it was regarded as a claim, rather than as an admitted ownership.
Plaintiff relies on Article II. It says that what would otherwise have been the broad effect of Article I was limited and made definite by Article II, when it specifically stated what was ceded and relinquished by Article I, viz., that part of the land up to that time particularly occupied by plaintiff band, which was not retained in plaintiff’s new four hundred thousand acre reservation.
The two articles are, on their faces, irreconcilable when applied to the actual situation of the parties. Plaintiff could hardly have said it was ceding and relinquishing “all the lands now owned, possessed, or claimed by them, where-ever situated,” intending thereby to relinquish only one piece of land whose situation was particularly described, unless it was unaware of' or had forgotten its interest in the other piece of land. If that was the case, the language of Article I would still show an intent to relinquish everything else it had, and take a specific four hundred thousand acre reservation. But it had not forgotten the treaty of 1851, since it expressly saved, in the treaty of 1858, its annuity rights under that treaty. We have no knowledge as to how plaintiff ever did regard the treaty of 1851, as to *65 whether it had conferred upon plaintiff an interest in land, since plaintiff never asserted a claim to such an interest until it filed this suit in 1924.
Plaintiff does not, however, argue that Article II of the treaty of 1858 negatived completely the broad effect of Articles I and XIY. It concedes that plaintiff in that treaty relinquished an interest which it had been vigorously asserting in some lands which several bands of the Sioux of the Mississippi had by two treaties made in 1851 purported to convey to the United States. Thus at least one interest, strongly asserted by plaintiff, not specifically mentioned in the treaty of 1858, and, according to plaintiff’s contention here, apparently eliminated from the broad language of release of that treaty by Article II, was intended to be relinquished. This fact contradicts plaintiff’s contention as to the intended effect of Article II.
Article II contains, in its last paragraph, quasi-covenants of seisin and of right to convey as to the lands there described. Plaintiff could hardly have given any such assurance with reference to the lands here in question, as to which it now asserts a tenancy in common but leaves in doubt whether each band of the Sioux had an equal share or a share proportionate to the number of its members. There may also have been doubt as to whether plaintiff band had any share at all, or whether the Sioux as a whole had- any property interest in the way of an Indian title in these lands. It seems that careless draftsmanship, in allowing plaintiff to limit its assurance of title to the land as to which its title was certain, by language which seemed to contradict that of Articles I and XIY of the treaty, has created the present problem.
As to the construction which the parties themselves placed upon the treaty of 1858, there seems to be no doubt. When ten years later some ten million acres of the lands in which plaintiff here asserts an interest were relinquished to the United States (15 Stat. 635, 2 Kappler 770), the other bands of the Sioux of the Missouri took part in the negotiations for the treaty, but plaintiff band did not, and claimed no right to do so. Its only protests following that treaty were based upon *66 assertions that that treaty gave more generous consideration to the other bands of the Sioux, most of which had been periodically hostile to the United States, than plaintiff, which had been consistently friendly, had received. When in 1876, a large part of the remaining lands were ceded by an agreement with the United States (19 Stat. 254, 1 Kappler 168), plaintiff was, without protest, omitted from the negotiations. Again, in 1889, when by statute (25 Stat. 888,1 Kappler 328, 336) the United States took the rest of the land in which plaintiff here claims an interest, and placed the other bands of the Sioux each upon a separate reservation, plaintiff was silent as to its having any interest in the lands taken.
In 1892 plaintiff made an agreement with the United States (28 Stat. 286, 314, 317-319), ceding to it a part of its reservation of 400,000 acres which it retained in the treaty of 1858. There were long negotiations preceding this agreement, and plaintiff’s negotiators insisted that plaintiff’s retention of the ownership of the Pipestone Quarry in Minnesota should be explicitly recognized in the agreement, as it had been in the treaty of 1858. Again there was no mention of the interest here claimed in the lands, to the west.
In 1899 an agreement was negotiated between plaintiff and the United States whereby plaintiff was to cede the Pipestone Quarries.[2] In these negotiations plaintiff refused to sign unless a memorandum of seven specific claims should be submitted to the Secretary of the Interior for his recommendation to Congress. During these negotiations, there was no mention of the claim here asserted.
Thus from 1858, when the treaty containing the broad language of relinquishment was used, to 1924, when this suit was filed, there was not, so far as the record shows, any assertion by plaintiff of the claim here made. We can account for this conduct only by assuming that plaintiff intended, by the treaty of 1858, to relinquish whatever interest it had in these lands. We think that this consistent course of conduct, this failure to assert a claim on repeated occasions when such assertion would have been the natural *67 action of a claimant, resolves whatever ambiguity was injected into the treaty of 1858 by Article II. The various bits of evidence relied on by plaintiff to show that it was not the understanding of the parties that plaintiff had no interest in the western lands do not seem to us to have substantial weight. A letter from a missionary and a polite reply from the Commissioner of Indian Affairs; the fact that $132,430.25 of the money agreed, in the treaty of 1868, to be paid to the other bands of the Sioux was, apparently inadvertently, paid to plaintiff band, to which other payments under other treaties were being made; the fact that members of plaintiff band did some roaming and hunting in the western lands after the treaty of 1858; none of these, or any other evidence relied on by plaintiff is sufficient to cast doubt upon the meaning of plaintiff’s conduct which we have recited.
There is nothing in the doctrine of construing ambiguous language against the party who drafted the instrument, or-in the doctrine of construing treaties between the United States and Indians favorably to the Indians, which would justify us in placing a meaning upon an instrument contrary to that which, for some eighty years, the parties to the instrument had themselves placed upon it.
In view of our conclusion that plaintiff by the treaty of 1858 relinquished whatever interest it may have had in the lands covered by the treaty of 1851, we do not consider or decide whether the treaty of 1851 gave to the Sioux tribe, or its various bands, including plaintiff, interests which the United States could not later take from them without compensation.
Plaintiff’s petition will be dismissed.
It is so ordered.
Jones, Judge; Whitaker, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.

 Congress did not ratify this agreement.