The **SIOUX TRIBE** et al.

v.

The **UNITED STATES**.

Appeal No. 13–72.

United States Court of Claims.

July 19, 1974.

Marvin J. Sonosky, Washington, D. C., attorney of record, for Rosebud Sioux Tribe, Standing Rock Sioux Tribe, Crow Creek Sioux Tribe, Lower Brule Sioux Tribe, Santee Sioux Tribe.

Arthur Lazarus, Jr., Washington, D. C., attorney of record, for Pine Ridge Sioux Tribe.

William Howard Payne, Washington, D. C., attorney of record, for Cheyenne River Sioux Tribe and Sioux Tribe of the Fort Peck Reservation, Montana.

Angelo A. Iadarola, Washington, D. C., attorney of record, for Yankton Sioux Tribe. Wilkinson, Cragun & Barker and Frances L. Horn, Washington, D. C., of counsel.

Craig A. Decker, Land & Natural Resources Division, Department of Justice, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for the United States.

Marvin J. Sonosky, Washington, D. C., attorney of record, for Sisseton and Wahpeton Bands of Sioux Indians, amicus curiae.

Before COWEN, Chief Judge, and DAVIS and SKELTON, Judges.

COWEN, Chief Judge:

The appeals and cross-appeals in this case require us to review eight interlocutory orders of the Indian Claims Commission. The appellants are eight groups of Sioux Indians. Their claims against the United States are filed under Docket No. 74 of the Indian Claims Commission and are based on certain wrongs alleged to have been committed by the United States against their ancestral tribes, i. e., the Teton Sioux Tribe, the Yanktonais Sioux Tribe, and the Sioux of the Santee Reservation in Nebraska. For convenience, the appellants will be referred to as the Docket 74 Sioux, since they are also appellees in certain of the cross-appeals. The Yankton Sioux Tribe, whose claims are filed under Docket No. 332–C of the Indian Claims Commission, is a present-day tribe. Its suits are based on wrongs allegedly committed by the United States against the ancestral Yankton Sioux Tribe. The tribe is a party to this appeal, both as an appellee and as a cross-appellant. The United States is a party to this appeal as an appellee and also as a cross-appellant.

*Appeal from 24 Ind.Cl.Comm. 147*

In its decision in Sioux Tribe of Indians v. United States, 15 Ind.Cl.Comm. 577 (1965), the Indian Claims Commission ruled that the 1851 Treaty of Fort Laramie (11 Stat. 749, 2 Kapp. 594) recognized the title of the "Sioux or Dahcotah Nation" to approximately 60 million acres of land situated west of the Missouri River in what are now the States of North and South Dakota, Nebraska, Wyoming and Montana. At that time, the Indian Claims Commission did not express an opinion as to what bands or groups constituted the "Sioux or Dahcotah Nation" in Article 5 of the treaty.[1] That question remained unresolved until 1970 when the Commission reached the following decision which is the subject of this appeal: (1) the phrase "Sioux or Dahcotah Nation" in the Fort Laramie Treaty included only the Teton and Yankton divisions of the Sioux (and not the Yanktonais); (2) the Teton and Yankton divisions of the Sioux held an undivided 83 and 17 percent interest respectively in the Sioux portion of the Fort Laramie land. 24 Ind.Cl.Comm. 147 (1970).

---

[1]. Article 5 of the Fort Laramie Treaty reads in pertinent part:

"The aforesaid Indian nations do hereby recognize and acknowledge the following tracts of country, included within the metes and boundaries hereinafter designated, as their respective territories, viz:

"The territory of the Sioux or Dahcotah Nation, commencing the mouth of the White Earth River, on the Missouri River; thence in a southwesterly direction to the forks of the Platte River; thence up the north fork of the Platte River to a point known as the Red Bute, or where the road leaves the river; thence along the range of mountains known as the Black Hills, to the head-waters of Heart River; thence down Heart River to its mouth; and thence down the Missouri River to the place of beginning. * * * *" 2 Kapp. 594.

The Commission based its decision upon an analysis of the history and purpose of the 1851 Treaty. It concluded that the United States intended the Fort Laramie Treaty to include only the Sioux located south or west of the Missouri River, which, as found by the Commission, were the Yankton and the Teton divisions of the Sioux. The Yanktonais Sioux, on the other hand, resided generally north or east of the Missouri River, were far removed from either of the transportation routes the treaty was designed to protect, and did not have a chief or other representative who signed the 1851 Treaty or the 1853 Senate amendment thereto.[2] Having so found, the Commission then proceeded to apportion the Fort Laramie land between the Tetons and the Yanktons. The Commission rejected the tribal theory (tenancy in common) for determining the respective interests of the claimants and apportioned the land on the basis of the total population of the two tribal divisions near the effective date of the treaty.

The Docket 74 Sioux (consisting mainly of the descendants of the Tetons and the Yanktonais)[3] first challenged the determination that the Yankton Sioux were entitled to an undivided 17 percent interest in the Sioux-Laramie land in a motion for rehearing. In this motion, the Docket 74 Sioux contended: (a) the 1851 Treaty only recognized title in those Indians permanently living on the land; (b) subsequent actions of the parties to the treaty showed the Yanktons had no interest, and (c) if population is the correct method for calculating the interests of the parties, only those Indians who actually lived on or used the land should be counted. On March 1, 1972, the Commission rejected the several contentions of the Docket 74

Sioux in an opinion denying the motion for rehearing, 27 Ind.Cl.Comm. 49 (1972).

While the Yankton Sioux support the Commission's decision, the Docket 74 Sioux and the Government are dissatisfied with one or another aspect of the Commission's ruling. The Docket 74 Sioux (appellants) claim that the term "Sioux or Dahcotah Nation" in the Fort Laramie Treaty includes three groups: Teton, Yankton, and Yanktonais, and that the Commission erroneously disregarded the language and history of the treaty as well as its contemporaneous administrative interpretation in excluding the Yanktonais from the 1851 Treaty. The Docket 74 Sioux further contend that the Commission erred in several respects in awarding the Yankton Sioux an undivided 17 percent interest in the Fort Laramie country; they argue (1) that Congress only intended to recognize title in the Indians actually occupying the land; (2) that in recognizing the 17 percent interest in the Yankton Sioux, the Commission adopted an interpretation contrary to the past construction given the 1851 Treaty by the parties; (3) that if population is the sole correct criterion for determining the relative interests of the Indian parties, then the Commission erred in failing to confine the population figures used to those Sioux who lived on the land in question; and (4) that the Commission's award of 17 percent interest to the Yankton Sioux is unreasonable and not supported by substantial evidence.

As shown *infra*, the Government contends that any claim based on the Treaty of Fort Laramie is barred by the statute of limitations. The Government also seeks to protect the public treasury from the possibility of double liability resulting from the Commission's rulings

2. For a complete account of the Senate proceedings and the tribal consent to the amendment, *see* 4 Kapp. 1065–81.

3. When the Indian Claims Commission decided 15 Ind.Cl.Comm. 577 (on August 27, 1965), the plaintiffs in Docket No. 74 and the plaintiffs in Docket No. 332–C (then

designated as Docket No. 332–A) both claimed an interest in the land covered by the Fort Laramie Treaty. On January 17, 1967, the Commission ordered that the two dockets be consolidated to determine the Sioux parties to the Fort Laramie Treaty and their respective interests in the land.

on the conflicting claims involved herein.[4] The Government has filed a cross-appeal, arguing that the Fort Laramie Treaty was intended to recognize the ownership in the Indians who held aboriginal title in the land at the time and that the case should be remanded to the Commission for a new division (replacing the prior division made by total population figures) on the basis of the Teton-Yankton aboriginal title interest.

 The question before us concerns the proper interpretation of the words "Sioux or Dahcotah Nation" in Article 5 of the Fort Laramie Treaty. Although the Commission's findings of fact are conclusive if supported by substantial evidence, this court must determine whether the Indian Claims Commission's conclusions of law are valid and supported by the Commission's findings of fact. 25 U.S.C. § 70s(b) (1970). We have repeatedly held that the interpretation of an Indian treaty is a question of law, not a matter of fact. *See* Citizens Band of Potawatomi Indians v. United States, 391 F.2d 614, 618, 179 Ct.Cl. 473, 482, cert. denied, 389 U.S. 1046, 88 S.Ct. 771, 19 L.Ed.2d 839 (1968); Minnesota Chippewa Tribe v. United States, 315 F.2d 906, 908, 161 Ct.Cl. 258, 262 (1963). Therefore, in approaching this case, we are free to reach an independent conclusion on the proper legal interpretation of the Fort Laramie Treaty and on the sufficiency of the evidence before the Commission to support its decision.

A. *The Indian Claims Commission did not err in excluding the Yanktonais Sioux from the 1851 Treaty.* The Docket 74 Sioux level a broad attack on the

Commission's evaluation of the scope of the Fort Laramie Treaty. Basically, the Docket 74 Sioux argue that the 1851 Treaty recognized title in the "Sioux of the Missouri," a term that includes the Teton, the Yankton, and the Yanktonais. This is a serious argument in light of certain aspects of the history and administration of the treaty. On balance, however, we find the Indian Claims Commission correctly resolved the conflicting claims on this issue.

We begin our examination of the 1851 Treaty by studying the language of the document itself and then turn to the background material to the extent necessary to ascertain the meaning of the treaty provision in question. The preamble of the Fort Laramie Treaty states that the treaty is between the United States "and the chiefs, headmen, and braves of the following Indian nations, *residing south of the Missouri River*, east of the Rocky Mountains * * *." 2 Kapp. 594 (emphasis added). The treaty further describes the territory of the "Sioux or Dahcotah Nation" (for treaty purposes) as partially circumscribed by the Missouri River on the north and east. *Id.*

The Docket 74 Sioux argue that the phrase "Sioux or Dahcotah Nation" clearly and unambiguously refers to the "Missouri Sioux" so that it is unnecessary to look to the background of the treaty. In this regard, the Yankton Sioux point out that the term "Sioux Nation" was traditionally used to describe Indians who spoke the Sioux or Dahcotah language, lived in contiguous areas, and whose relationships with one another were friendly; the Yankton, Te-

---

4. After the Commission's decision in 24 Ind. Cl.Comm. 147 (1970), the Sioux 74 plaintiffs filed a motion requesting leave of the Commission to file amendments to their petition in Docket No. 74. The amendment in question claimed that the Commission's ruling in 24 Ind.Cl.Comm. 147 deprived plaintiff's ancestors of 17 percent of their aboriginal title and that plaintiff should be compensated for that loss. The Commission allowed the petition to be amended stating:

"It is the position of the United States that it cannot possibly be held liable twice for any portion of the Sioux Laramie land. We disagree. If the plaintiffs are able to prove that they owned 100% of this land prior to the Fort Laramie Treaty, and that after that treaty they retained less than that 100% interest, then the United States can be held liable for whatever interest the plaintiff's lost under the treaty." Sioux Nation v. United States, 27 Ind.Cl.Comm. 79, 85 (1972).

ton, and Yanktonais were self-governing units; they were a part of seven major divisions (Medawakantons, Wahpakootas, Sissetons, Wahpetons, Yanktons, Yanktonais, and Tetons) which have traditionally been thought of as the Sioux Nation; the term "Missouri Sioux" or "Sioux of the Missouri" was used principally to designate location; and the "Missouri Sioux" have never been recognized as a distinct land-owning entity.

The 1851 Treaty does not expressly refer to the "Missouri Sioux." In fact, the geographical limitations on the scope of the treaty indicate that it was not intended to extend to those divisions of the Sioux located north and east of the Missouri River and lacking significant contact with the area dealt with by the treaty.

The United States has used the terms "Sioux" or "Sioux Nation" in four treaties referring, on occasion, to different entities.[5] Subsequent attempts to identify the Sioux party to some of these treaties have focused on the purpose of the treaty, identification of the band of Sioux whose participation was necessary

to that purpose, identification of the band which participated in the treaty, and, where available, the identity of the band or bands from whom cession was accepted of the land involved.[6]

Without reference to the Fort Laramie Treaty the phrase "Sioux or Dahcotah Nation" could encompass the Teton, Yankton, Yanktonais, and the four Mississippi divisions of the Sioux. Even the Docket 74 Sioux do not contend that the Mississippi Sioux divisions are included in the treaty. It is unimportant that the United States concluded several treaties with one or another of the bands of the Sioux in which the treaty language referred specifically to the band and did not use "Sioux" or "Sioux Nation" to identify the Indians. The fact that the persons negotiating the Fort Laramie Treaty for the United States may have known which Sioux divisions were parties to the 1851 Treaty does not render the language clear on the face of the treaty. We are charged with discovering the intent of the parties, and in this instance, an analysis of the history and purposes of this particular treaty is particularly helpful.[7]

5. Treaty of September 23, 1805, 2 Kapp. 1031; Treaty of Prairie des Chiens of August 19, 1825, 7 Stat. 272, 2 Kapp. 250; Treaty of September 29, 1837, 7 Stat. 538, 2 Kapp. 493; Treaty of April 29, 1868, 15 Stat. 635.

6. The Treaty of September 23, 1805, 2 Kapp. 1031, was made with the "Sioux Nation." It provided for payment to "the Sioux," and, as in the present case, the Indian parties were identified only by their names (without band designation). The Indian Claims Commission identified the Indian parties to the 1805 Treaty as the Medawakanton Band of the Sioux, noting that the Government dealt solely with the Medawakanton chief and that Medawakanton aboriginal occupancy had been proved. 10 Ind.Cl.Comm. 137, 141–49, 181–82 (1962).

The Treaty of Prairie des Chiens of August 19, 1825, 7 Stat. 272, 2 Kapp. 250, was a treaty similar to the 1851 Treaty of Fort Laramie in that it defined boundaries between various tribes of Indians. The Sioux parties to that treaty were designated simply as the "Sioux," except for the absent Yankton band, which was designated as the "Yankton band." This treaty was signed by

a number of Indians for the "Sioux." A number of the signatories included a band designation, but many merely signed as Sioux. With references to the 1825 Treaty, the Indian Claims Commission concluded that the "Sioux" in whom title was recognized were the four Mississippi bands. The interpretation was prompted by the fact that "it was the Mississippi Sioux who found themselves embroiled with their traditional enemies" in the area involved in the treaty (10 Ind.Cl.Comm. at 182). The Commission further found that within the area set aside for the Sioux in the Treaty of Prairie des Chiens, each of the four Mississippi bands can be identified with a certain section (10 Ind.Cl.Comm. at 184–85), and that in subsequent treaties cession was taken of the Prairie des Chiens lands not from the "Sioux" but from the individual bands of the Mississippi Sioux who claimed ownership (10 Ind.Cl.Comm. at 186–87).

7. Where treaty language is not clear and unambiguous, we have often looked to the history and purpose of the treaty involved to ascertain more clearly the intended meaning. *See* Citizens Band of Potawatomi Indians v. United States, 391 F.2d 614, 619, 179 Ct.Cl.

The background of the Fort Laramie Treaty has been thoroughly studied by this court and the Indian Claims Commission, and it need not be exhaustively recounted here.[8] Starting on October 20, 1947, official reports and correspondence of the various Superintendents and Commissioners of Indian Affairs began to focus on the need for treaties of peace and friendship. These records indicate that the Government sought to initiate treaty negotiations primarily to promote peace among these tribes, to protect settlers and other travelers along the Platte and Arkansas Rivers, and to help establish responsibility for any depredations that might be committed in a particular area. *See* 24 Ind.Cl.Comm. at 163–71. *See also* Crow Tribe of Indians v. United States, 284 F.2d 361, 365, 151 Ct.Cl. 281, 286 (1960), cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961); Indians of the Fort Berthold Reservation v. United States, 71 Ct.Cl. 308, 330–331 (1930); Sioux Tribe v. United States, 21 Ind.Cl.Comm. 371, 376 (1969).

As the concept of the treaty began to take shape, the Government looked to the particular tribes that had been troublesome and their geographic location. For example, on October 13, 1849, Superintendent of Indian Affairs Mitchell wrote in his annual report:

I have already had the honor to urge upon the Department the necessity of holding a general council to assume the character of a treaty, with the *wandering tribes inhabiting the plains, extending from the Missouri to the borders of Texas* * * *. Justice as well as policy requires that we should make some renumeration for the damages these Indians sustain in consequence of the destruction of their game, timber &c., by the whites passing through their country. A small annual present of Indian goods distributed among the tribes, with reference to their numbers, localities, &c., would be deemed satisfactory by them, and at the same time serve as a guarantee for their good behavior * * *. *The propriety of including the Sioux south of the Missouri river, will be obvious when it is taken into consideration that they are frequently found in large bodies along the Santa Fe road; and to my knowledge many of the depredations that have been charged against the Commanches and other southern tribes, have been committed by the Sioux residing south of the Missouri river.* 24 Ind.Cl.Comm. at 166–67 (emphasis added).

On March 18, 1950, the Senate Committee on Indian Affairs reported a bill "to enable the President to negotiate with the *Indians of the prairies, south and west of the Missouri river* to the northern line of the State of Texas, embracing the Indians of the Mountains, and including those of New Mexico." S. 157, 31st Cong., 1st Sess. (1850) (emphasis added). This bill would have authorized the President to negotiate treaties "between the United States and the several tribes of Indians living and hunting south and west of the Missouri river, and north of the northern line of the State of Texas, commonly known and designated as the Indians of the Prairies and Mountains." *Id.* The bill was accompanied by a report from Superintendent Mitchell in which he said: "The tribes proposed to treat with occupy the range of prairie and mountain country lying south of the Missouri river, and north of Texas." S.Misc.Doc.No. 70, 31st Cong., 1st Sess. 4 (1850). Superin-

473, 482 (1967), cert denied, 389 U.S. 1046, 88 S.Ct. 771, 19 L.Ed.2d 839 (1968); Lower Sioux Indian Community v. United States, 163 Ct.Cl. 329, 332–333 (1963).

8. *See* Crow Tribe of Indians v. United States, 284 F.2d 361, 364–367, 151 Ct.Cl. 281, 285–291 (1960), cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961);

Crow Nation v. United States, 81 Ct.Cl. 238, 242–248 (1935); Indians of the Fort Berthold Reservation v. United States, 71 Ct.Cl. 308, 311–316, 330–333 (1930); Sioux Nation v. United States, 24 Ind.Cl.Comm. 147, 163–71 (1970); Sioux Tribe v. United States, 21 Ind.Cl.Comm. 371, 375–77 (1969); Cheyenne & Arapahoe Tribes v. United States, 10 Ind.Cl.Comm. 1, 1–7 (1961).

tendent Mitchell also submitted a list of the tribes to be included in the treaty with an estimate of their respective populations. One of the tribes noted on this list was "Sioux, (South Missouri)." *Id.* at 3. This bill passed the Senate by a unanimous vote but was not acted upon by the House. In his annual report, dated September 14, 1850, Superintendent Mitchell reported continued unrest among the "prairie, or wandering tribes, inhabiting the vast region of country lying between the Missouri and the State of Texas." 24 Ind.Cl.Comm. at 168.

On February 27, 1851, Congress appropriated $100,000 "for expenses of holding treaties with the wild tribes of the prairie, and for bringing delegates to the seat of government." Act of Feb. 27, 1851, ch. 12, 9 Stat. 572. The assertion by the Docket 74 Sioux that the broad phrase "Indian tribes of the prairies" evolved after 1850 to include all tribes of the upper Missouri River, regardless of their connection with the treaty area, is weakly supported and unpersuasive in view of the other evidence on this point. We find that Congress did not intend to expand the treaty beyond the scope of the prior Senate bill or the recommendations of Superintendent Mitchell. Mitchell's appointment as one of the negotiators of the treaty underlines the acceptance by the United States of his theory of the scope of the proposed treaty.

█ The language of the 1851 Treaty and the background materials already discussed clearly show that the treaty included only the Sioux occupying the area south and west of the Missouri River. Because the Yanktonais lived east of the Missouri River and there is no showing that they used the Fort Laramie land to a significant extent, we conclude that the Yanktonais were not a party to the 1851 Treaty. Other aspects of the treaty's background lend less support to this conclusion or are somewhat contradictory, but we are not persuaded to the contrary.

The Commission relied heavily upon the fact that a representative of the Yanktonais did not sign the 1851 Treaty or its 1853 amendment. We agree this is a telling point, although not conclusive in view of the augeries of the negotiations in this particular treaty. The Commission found that five of seven Teton bands did not sign the 1851 Treaty and two Teton bands (the Hunkpapa and the Blackfeet) did not sign the treaty or the amendment. Moreover, none of the signers executed the treaty on behalf of the Teton or Yankton divisions of the Sioux specifically—all signed as members of the "Sioux or Dahcotah Nation." Also, the 15 signers of the 1853 amendment were identified as "Sioux of the Platte" or "Sioux of the Missouri." There is, however, no indication that the signers acted on behalf of the Tetons, Yanktons, and Yanktonais. The Sioux chiefs were apparently assembled, as much as possible, from the territory to be covered by the treaty and the absence of the Yanktonais is significant.

The Docket 74 Sioux further assert that the purpose of achieving peaceful relations among the various tribes could not be achieved without the inclusion of the Yanktonais and that the United States included the Yanktonais among the Sioux receiving funds appropriated to fulfill the 1851 Treaty. As for the purpose argument, one of the primary purposes of the treaty was to secure safe passage for travelers along the Oregon and Santa Fe Trails. To fulfill this goal, among others, peaceful relations among the tribes was encouraged, and the divisions of the Sioux within the geographical bounds of the treaty were sought out. Article 6 of the treaty (2 Kapp. 595) and a statement by Superintendent Mitchell on the first day of the Treaty Council indicate that the chiefs were to speak for their respective nations. But the signers clearly did not purport to speak for the Sioux located along the Mississippi River. Similarly, the Yanktonais did not make significant use of the Fort Laramie land, and they were too far removed from either of the

routes of travel to have been essential to the design of the treaty.[9]

While the Docket 74 Sioux state that General Accounting Office Reports show that the Yanktonais received funds appropriated to fulfill the 1851 Treaty, these reports show that the Poncas, Comanches, Kiowas and Apaches also received funds under the treaty. The Commission notes that these tribes were not parties to the Treaty of Fort Laramie and that reports of payment to the Yanktonais contained errors which "cast doubt on their reliability as evidence." 24 Ind.Cl.Comm. at 157. We do not find that the Government recognized any part of the ownership of the land by the Yanktonais by the payment of funds under these circumstances.

The Commission found as a factual matter that the Yanktonais generally resided north or east of the Missouri River. 24 Ind.Cl.Comm. at 155, 171–72. This finding is supported by substantial evidence and entitled to finality under our standard of review, 25 U.S.C. § 70s(b) (1970). We also note that the Docket 74 Sioux had ample opportunity to present evidence before the Commission concerning the extent to which the Yanktonais used the Fort Laramie land and that the Docket 74 Sioux have not shown that the Yanktonais were involved to a significant degree in the Fort Laramie land. Consequently, we do not believe the case should be remanded for further hearings to determine the involvement of the Yanktonais in lands west of the Missouri.

As a final point on the exclusion of the Yanktonais from the 1851 Treaty, we note that all the experts testifying before the Commission—those testifying for the Yankton and the Docket 74 Sioux—concluded that the Yanktonais were not a party to the Fort Laramie Treaty.

B. *Apportionment of the Respective Interests of the Yankton and Teton Divisions of the Sioux in the Fort Laramie Land.* In considering the proportionate share of the Fort Laramie land to be divided between the Yankton and Teton Sioux, it is necessary to evaluate the basis by which the Yanktons and the Tetons derive their interest in this territory. The question here is whether the 1851 Treaty recognized title in both the Yankton and Teton Sioux, and if so, what is the proper basis for allocating the interests between the two parties. The Docket 74 Sioux maintain that the 1851 Treaty merely confirmed ownership of the land only in the Indians actually using the land and that the actual use and occupancy test is the correct basis for determining Teton-Yankton recognized title in the Fort Laramie land. Secondly, the Docket 74 Sioux argue that, if population is the proper method for determining the relative interests of the Sioux parties, the Commission should have considered only the members of the Teton and Yankton Sioux actually using the Fort Laramie land. The Government, as cross-appellant, contends that the proper way of dividing up the Sioux recognized title is by a determination of which portion of the land each Sioux party held under aboriginal title, because this method would avoid the possibility of double liability by the Government (previously discussed).

As we discussed in part A above, the term "Sioux or Dahcotah Nation" in the 1851 Treaty included only those divisions of the Sioux located south and west of the Missouri River. Both Teton and Yankton Sioux chiefs took part in negotiating and executing the 1851 Treaty. The homelands of the Teton Sioux are in this area west of the Missouri River. Moreover, the Commission found that the Yanktons "occupied, to some extent, lands south or west of the Missouri River" (24 Ind.Cl.Comm. at

---

9. The letter from Alfred Vaughn, Upper Missouri Agency, Fort Pierre, Dakota Territory, dated September 29, 1853, indicates his belief that the Yanktonais were bound by the 1851 Treaty and its amendment. This lone piece of evidence is not persuasive in view of the other evidence limiting the scope of the treaty to exclude the Yanktonais.

154), and there is substantial evidence in the record to support this finding.[10]

■■ In drafting the 1851 Treaty, the United States sought to deal with the Indians in each area who were in sufficient strength to pose a problem to intertribal peace and the safety of travelers crossing the land. It is not necessary to examine that presence to determine whether each of the parties held exclusive use and occupancy for a long period of time, as the Government contends. Article 5 of the Treaty was intended to recognize title to the land in the tribes actually using it without regard to whether or not they then had aboriginal title thereto. Recognized title is based on a grant from Congress, and, as a rule, is not dependent upon the existence of aboriginal title in the recipients.

However, our rejection of the need to establish aboriginal title does not preclude any inquiry into the extent to which the Tetons and the Yanktons used the land. Since Congress intended to recognize title in those Indians actually occupying or using the land, it is desirable, if possible, to determine the percentage of the total population of each of the claimants who used and occupied it.

In refusing to determine the treaty rights between the Yankton and the Teton Sioux on the basis of which party may have held aboriginal Indian title, we are in accord with our prior decisions involving the Fort Laramie Treaty. While the court spoke of "title by right of occupancy" in Indians of the Fort Berthold Reservation v. United States, 71 Ct.Cl. 308, 332 (1930), and this opinion was quoted in Crow Tribe of Indians v. United States, 284 F.2d 361, 368, 151 Ct.Cl. 281, 292–293 (1960), cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961), the court was not establishing aboriginal Indian title, as

that term is not defined, as the basis for evaluating which interests were recognized by the 1851 Treaty. Moreover, in dealing with the Assiniboine portion of the Fort Laramie land, the court found it unnecessary to determine the aboriginal Indian title to the land because "the lands were *expressly granted* to plaintiff tribe by the treaty * * *." Assiniboine Indian Tribe v. United States, 77 Ct.Cl. 347, 370–371 (1933), cert. denied, 292 U.S. 606, 54 S.Ct. 772, 78 L.Ed. 1467 (1934) (emphasis added). The Fort Laramie Treaty was clearly a treaty of recognition, Crow Tribe of Indians v. United States, 284 F.2d at 363–371, 151 Ct.Cl. at 285–297. We think that the best method for determining the respective interests of the Tetons and the Yanktons in the Fort Laramie land is by assigning the interests on the basis of the number of Tetons and Yanktons who actually used and occupied the land.

The formula for assigning the interests on a total population basis used in Blackfeet & Gros Venetres Tribe of Indians v. United States, 18 Ind.Cl.Comm. 289, 321 (1967), may not be appropriate in this instance. The *Blackfeet* formula is based on the principle that, where title to a particular area is recognized in more than one tribe, each member of the tribe receives an equal right to use the land; consequently, each tribe takes an interest in the land proportionate to its total population. *See* 27 Ind.Cl.Comm. at 54. This method results in an approximation of the relative use and occupancy of the territory in question. It is especially convenient where there is difficulty in proving actual use of the land. In this instance, however, comparing the total population of the two divisions of the Sioux treats the Yanktons as if they all were using the Fort Laramie land, when, in fact, only a portion of the Yankton Sioux may have actually used this territory.

10. In Yankton Sioux v. United States, 97 Ct.Cl. 56, 61 (1942), the court noted:
"Both before and after the Treaty of 1858 members of plaintiff [Yankton] band *hunted* *and roamed in the Sioux lands, as recognized by the treaty of 1851.*" (Emphasis added.)

In a concurring opinion in a motion for rehearing before the Commission, Commissioner Yarborough stated that:

This Treaty was not a grant of new lands, but a recognition by the United States of a pre-existing use and occupancy by the tribes. Whatever the element of granting in it (as opposed to acknowledgment), it was to tribes as their occupancy interests would appear, not per capita or by a named fraction to each tribe. The relative use and occupancy of the area by each tribe depends on their subsistence patterns, [footnote omitted] which here depends on their numbers using the land in question. For this equation to be accurate, all the land used by all the Indians in question must be used in the calculation, as the Docket 74 plaintiffs suggest. The language of the *Blackfeet* case, *supra,* is correct in showing the dependence of population figure calculations on the underlying facts of use and occupancy * * *. 27 Ind.Cl.Comm. at 56–57.[11]

We agree that the Sioux parties should take a proportionate interest in the Fort Laramie land according to their respective occupancy interests. The comparison of the total population of the two parties (wherever situated) at the time of the 1851 Treaty does not take into account the members of each division actually using the land. In a case decided subsequent to the decisions under review, the Commission found that evidence of actual use and occupancy could be considered in dividing recognized title areas, James Strong v. United States, 30 Ind.Cl.Comm. 337, 345 et seq. (1973), and in another case, the Commission stated that evidence as to the use of the recognized title area by the respective tribes may be weighed as an alternative to comparing the total population figures. Kiowa, Comanche & Apache Tribes of Indians v. United States, 26 Ind.Cl.Comm. 101, 120 (1971), rev'd on other grounds, 479 F.2d 1369, 202 Ct.Cl. 29 (1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974). Because the ultimate question in this case on apportionment of the interests is the degree to which the two divisions of the Sioux used and occupied the Fort Laramie land, all relevant material should be taken into consideration. Only if there is insufficient evidence to determine the population of the two divisions actually using the Fort Laramie land, should the Commission resort to a comparison of the total population of the two parties.

■ The Docket 74 Sioux argue, however, that, in no case, should the Commission's previous determination on the basis of total population be allowed to stand because it is based on unreliable evidence. The Docket 74 Sioux primarily contend here that the Commission erroneously based the calculation on the number of lodges without sufficient evidence of the number of Indians per lodge and that the Commission should have based its allocation on the so-called "headcount" in 1862 of the Sioux in the Missouri area. In making its decision, the Commission evaluated several population estimates, rejecting some and relying on others. The Commission explained that it based its determination of the respective populations on three estimates "chosen because they were all made by government officials as part of their official duties, included all the known Sioux rather than merely those present for a head count, and were made close enough in time to the effective date of the treaty to make them reliable." 24 Ind.Cl.Comm. at 159. In determining the relative populations of the two divisions, it is reasonable to rely on the respective number of lodges. Although Harney estimated all lodges to contain three Indians while Warren and Vaughn estimated all lodges to contain eight Indians, this fact will not disturb

---

11. Commissioner Yarborough states that he did not dissent from the denial of rehearing because "it has not been shown that evidence exists that would allow the Commission to make any reasonably accurate determination of actual use and occupancy . . . . " 27 Ind.Cl.Comm. at 57.

the percentage figures for evaluating the comparative population for each evaluator.[12] As long as the Yankton lodges and the Teton lodges, on the average, are estimated to contain the same number of Indians, the relative population of the two parties will not be disturbed. We recognize that the discrepancy in the estimates of the number of Indians per lodge indicates that these reports may be in error in the number of lodges, but the Docket 74 Sioux do not have a more reliable means for determining comparative population.

The Docket 74 Sioux have not shown that the 1862 population figures provide a more accurate estimate of the comparative populations at the time of the treaty. The Commission rejected the population estimates published in the 1862 Annual Report of the Commissioner on Indian Affairs because they give a "distorted picture of the total Sioux population." 24 Ind.Cl.Comm. at 159.[13] The Commission also noted that the 1862 estimates were made a full 9 years after the effective date of the treaty. We recognize the difficulty in estimating the populations of the various Sioux divisions. *Cf.* Sioux Tribe of Indians v. United States, 84 Ct.Cl. 16, 29–30 (1936), cert. denied, 302 U.S. 740, 58 S.Ct. 139, 82 L.Ed. 572 (1937). While the Docket 74 Sioux have discovered a discrepancy in the estimates used by the Commission, the Docket 74 Sioux have not shown the Commission's figures are unsupported by substantial evidence or that the method for determining the comparative population is more unreliable than the method they have suggested.[14]

We remand this portion of the case to the Indian Claims Commission to determine whether there is sufficient evidence of actual use to apportion the land on the basis of the comparative population of the Teton and Yankton divisions of the Sioux actually using the Fort Laramine land. If there is sufficient evidence, the apportionment should be made on that basis. On the other hand, if the parties are unable, after being given a reasonable opportunity to do so, to produce sufficient evidence to enable the Commission to apportion the interests in the land on that basis, the apportionment previously made by the Commission in its order of December 2, 1970, will be acceptable.

### Appeal from 22 Ind.Cl.Comm. 344

In its cross-appeal, the Yankton Sioux Tribe seeks reversal of this order of the Commission which held that the United States did not recognize title in the Yankton Sioux Tribe to Royce Area 410 by ratifying the Treaty of April 19, 1858, 11 Stat. 743, which ceded Royce Area 410 to the United States.

The principal argument advanced by the Yankton Sioux is that Congress, by ratifying the Treaty of 1858, intended to ratify the warranty of title contained in the treaty and thereby recognized title in the Yankton Tribe. Article II of the

---

12. On September 20, 1853, Agent Alfred D. Vaughn of the Upper Missouri Agency reported his estimates of the Sioux population. 24 Ind.Cl.Comm. at 173. Brigadier General W. S. Harney led a military expedition against the Sioux in 1855. *Id.* at 172–74. Lieutenant G. K. Warren gave his population estimates in an 1856 report of his explorations. *Id.*

13. The Commission stated:
 "We rejected the population estimates published in the 1862 Annual Report of the Commissioner of Indian Affairs because it is apparent that the Yankton population was the result of an exact head count, while the figures from the Upper Platte and Upper Missouri agencies were estimates. It is likely that the agents for the Upper Platte and Upper Missouri included all of the Sioux known by them to be in their agencies. On the other hand, it is doubtful that the Yankton agent included those Yankton who were off the reservation hunting at the time of the census. These population figures, therefore, give a distorted picture of the total Sioux population * * *." 24 Ind.Cl. Comm. at 158–59.

14. We need not reach the questions raised in the alternative concerning the tenancy in common theory.

treaty, which contained the warranty relied upon, is as follows:

> *Article II.* The land so ceded and relinquished by the said chiefs and delegates of the said tribe of Yanctons is and shall be known and described as follows * * *. [Royce Area 410]

> And the said chiefs and delegates hereby stipulate and agree that all the lands embraced in said limits are their own, and that they have full and exclusive right to cede and relinquish the same to the United States. (11 Stat. 744)

We reject this argument, as did the Indian Claims Commission. In its decision, the Commission summarized evidence which shows that at the time of the ratification, Congress knew that the title of the Yankton to the ceded land was disputed by other tribes. In those circumstances, the Commission held that it was unlikely that the Senate would recognize title through the device of ratifying a warranty of title. We agree.

■ Our interpretation of the language of the treaty without resort to extraneous evidence leads to the same conclusion. The Treaty of 1858 was, as we have said, a cession treaty which conveyed Royce Area 410 to the Government but retained an area containing 400,000 acres (Royce 411) as a reservation for the Yanktons. Broad assertions of title or other claims made by the Indians in treaties of cession do not establish recognized title to the ceded lands. Sac and Fox Tribe of Indians v. United States, 315 F.2d 896, 900, 161 Ct.Cl. 189, 197, cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963).

The Yankton Sioux also contend that our decision in Yankton Sioux v. United States, 97 Ct.Cl. 56 (1942) held that the warranty quoted above recognized the title of the tribe to the ceded land. We have examined that decision carefully, and we find nothing which can be characterized as a holding that the treaty recognized Yankton title to the land. The issue before the court in that case

was whether the Yankton Tribe had ceded all of its lands under the Treaty of 1858, except for the Royce 411 Reservation. Although the court emphasized the extent to which the Yankton Tribe had given assurance of title, there was no occasion for the court to consider the question of recognized title and it made no decision on that question.

In order to establish recognized title to lands in an Indian tribe, it is essential to show that there was a congressional intent in the treaty of recognition to accord the Indians permanent occupancy in the subject lands. The Yankton Tribe has failed to show such an intent in this instance. It is true that Article III guaranteed the Yankton quiet and undisturbed possession of their settlement until they removed to their reservation, but the treaty expressly provided that the removal was to take place within one year. As the Commission correctly pointed out, this provision emphasized the temporary nature of the Yanktons' rights in the land. A definite congressional intention to accord legal rights and "not merely permissive occupation" is the requisite legal standard for recognized title. *See* Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 278–279, 75 S.Ct. 313, 99 L.Ed. 314 (1955); Sac and Fox Tribe of Indians v. United States, *supra*; Miami Tribe v. United States, 175 F.Supp. 926, 936–940, 146 Ct.Cl. 421, 439–445 (1959).

In summary, we conclude that the argument of the Yankton Sioux fails to recognize the distinction that has been developed over the years between treaties of cession and treaties of recognition. The cross-appeal of the Yankton Sioux is therefore denied, and the Commission's decision on this issue is affirmed.

*Appeal From 23 Ind.Cl.Comm. 419*

In this decision the Commission determined that the Teton and Yanktonais [15] had aboriginal title to approximately 14 million acres of land east of the Mis-

---

15. The Docket 74 Sioux are the descendants of the Teton and Yanktonais Sioux.

souri River. The land was ceded to the United States by the Treaty of April 29, 1868, 15 Stat. 635. The Docket 74 Sioux have appealed on the ground that the Commission erroneously excluded 281,000 acres of land from their title claim. The acreage lies between the north or main branch of East Medicine Knoll Creek and its south branch. The land is part of a triangular tract of 900,000 acres of land located on the edge of territory traditionally used by the Yankton Sioux Tribe to the south and east, the Yanktonais Sioux to the north and east and the Teton Sioux to the west. The Commission fixed the southwestern boundary of the lands claimed by the Teton and Yanktonais on a line congruent to the north branch of East Medicine Knoll Creek.

It would be helpful to an understanding of this portion of the appeal to review the history of the claim to this area. In 22 Ind.Cl.Comm. 344, the Commission determined that the boundary of Royce Area 410 followed the northern branch of East Medicine Knoll Creek. That order of the Commission allowed the Docket 74 Sioux to intervene in the Yankton Sioux's claim (Docket 332–C) of aboriginal title to Royce Area 410 and to claim aboriginal title to the same land. The two dockets were then consolidated for the limited purpose of determining which of the competing parties had aboriginal title to Royce 410.

In its decision of December 14, 1970, 24 Ind.Cl.Comm. 208, the Commission held that, while the Yankton Sioux had aboriginal title to most of Royce 410, about 600,000 acres of land in the northwestern portion (including the Medicine Knoll area) and other acreage in the northeastern portion of Royce Area 410 should be excluded due to the failure of the Yankton Sioux to prove exclusive use and occupancy. We deal with that decision in the next section of this opinion.

Motions for rehearing in which the Docket 74 Sioux requested the Commission to restore the 281,000 acres of land

to the description of the aboriginal land ceded in 1868 were denied by the Commission on January 6, 1971 (24 Ind.Cl. Comm. 364) and March 8, 1972 (27 Ind. Cl.Comm. 79).

In the motion for rehearing (denied in 24 Ind.Cl.Comm. 364), the Docket 74 Sioux offered evidence which they hoped would convince the Commission to change the boundary line of Royce Area 410 and thereby automatically restore the 281,000 acres to their claim of aboriginal title to the land ceded by the Treaty of 1868. This evidence was in the form of an alleged "true 1858 Mix Map." The Docket 74 Sioux presented no new evidence as to use and occupancy of the Medicine Knoll area nor did they point to any evidence previously submitted on the issue. The Yankton Sioux, on the other hand, claimed that the Commission had correctly fixed the boundary line and that the Mix Map supported this view. The Commission found it unnecessary to resolve this dispute, and denied the motion on the ground that the Docket 74 Sioux had simply failed to prove that their ancestors had exclusive use and occupancy of the disputed territory.

The second motion for rehearing was denied as being contrary to the rules of the Commission which require leave of the Commission to move again after a previous rehearing has been denied. The Commission found the motion to be the same as the motion denied on January 6, 1971.

In their efforts to avoid their failure of proof, the Docket 74 Sioux rest on the broad assertion that the excluded land was surrounded on all sides by territory which the Commission found belonged to the Teton and Yanktonais Sioux or to the Yankton Tribe. Thus, they contend that the Commission provided no findings or other reason for leaving a "no man's land" or "hole" in the center of Sioux country. They rely on Lower Sioux Indian Community v. United States, 163 Ct.Cl. 329, 336, 338 (1963) for the proposition that it would be arbitrary for the Commission to ex-

clude a buffer zone from the award. However, our holding in the *Lower Sioux* case concerned recognized title, not aboriginal title which is established only by proof of exclusive use and occupancy for a long period of time. It is not unusual in Indian litigation to find that there are lands lying between the territory of two competing tribes, because the proof shows that such land was not exclusively used or occupied by either. In its brief, the Government has called our attention to several cases where that occurred, Sac and Fox Tribe of Indians v. United States, 383 F.2d 991, 179 Ct.Cl. 8, cert. denied, 389 U.S. 900, 88 S.Ct. 220, 19 L.Ed.2d 217 (1967); Iowa Tribe of the Iowa Reservation v. United States, 22 Ind.Cl.Comm. 232 (1969), aff'd, 195 Ct.Cl. 365 (1971), cert. denied, 404 U.S. 1017, 92 S.Ct. 677, 30 L.Ed.2d 664 (1972), and Muckleshoot Tribe of Indians v. United States, 3 Ind.Cl.Comm. 658, 677 (1955), aff'd, 174 Ct.Cl. 1283, cert. denied, 385 U.S. 847, 87 S.Ct. 88, 17 L.Ed.2d 77 (1966).

The Docket 74 Sioux maintain that the Commission's decision should be reversed, because the Commission failed to make any findings supporting the omission of the 281,000 acres. In this respect, the Docket 74 Sioux endeavor to shift the burden of proof from themselves to the Commission. The Commission did find, upon the basis of all the evidence offered, that the Docket 74 Sioux had failed to establish exclusive use and occupancy of the land, and we hold that this finding of failure of proof is sustained by substantial evidence. *Cf.* Six Nations v. United States, 173 Ct.Cl. 899, 911 (1965).

In its cross-appeal, the United States contends that the Commission erred, because it found that the Teton and Yanktonais Sioux had aboriginal title to the land east of the Missouri without making any showing as to what part of the land was exclusively used by each. However, the cases cited by the Government involve competing groups which claimed the same territory. For example, in Iowa Tribe of the Iowa Reservation v. United States, 195 Ct.Cl. 365 (1971), cert. denied, 404 U.S. 1017, 92 S.Ct. 677, 30 L.Ed.2d 664 (1972), the Iowa plaintiffs and the Sac and Fox plaintiffs asserted competing separate interests in the same land. Neither showed exclusive use and occupancy. However, the Teton and Yanktonais are not antagonists competing for the same territory. The award here is to the Docket 74 Sioux who are the legitimate representatiives of the Teton and Yanktonais on whose behalf this action is asserted. *All* the Docket 74 Sioux, except the Sioux of the Santee Reservation, are comprised at least in part of Yanktonais and Teton decendants or both. The Government has no right to complain because the descendants chose to assert the joint interest of their ancestors rather than compete for separate interests.

The Government's attempt to bifurcate the action is in effect an attempt to relitigate the question of the Indian Claims Commission's jurisdiction to hear and determine claims. This court stated in Thompson (Indians of California) v. United States, 122 Ct.Cl. 348, 357, cert. denied, 344 U.S. 856, 73 S.Ct 90, 97 L.Ed. 665 (1952):

> Congress clearly intended in circumstances such as we have here, to confer upon the Indian Claims Commission jurisdiction to hear and determine claims that might be presented to it by groups of Indians, * * * even though the ancestors of such group existed as separate bands or villages at the time the claim arose.[16]

For the reasons stated, the orders of the Commission involved in this portion of the appeal are hereby affirmed.

*Appeal From 24 Ind.Cl.Comm. 208*

In this order, the Indian Claims Commission determined that the Yankton Sioux Tribe had aboriginal title to the major portion of Royce Area 410

---

16. *See also* United States v. Northern Paiute Nation, 393 F.2d 786, 792, 183 Ct.Cl. 321, 332 (1968).

when the tribe ceded that land to the United States by the Treaty of April 19, 1858 (11 Stat. 743). The Yankton Sioux Tribe, the Docket 74 Sioux, and the United States each seek review of the order but on different grounds.

The Commission excluded land in the northwestern corner of Royce Area 410 on the ground that the evidence did not show any Yankton occupancy of the land above the big bend of the Missouri River prior to 1853, a date too late for Yankton title to ripen before the cession of 1858. The Commission relied on documentary evidence in support of its finding, whereas the evidence to the contrary consisted primarily of information gathered by expert witnesses for the Yankton Sioux Tribe. The testimony of these experts was based on tribal traditions. The Commission correctly found that, at the most, this evidence showed that at some unascertained time, the Yankton Sioux Tribe may have used the excluded area.

The Commission also excluded a tract of land lying in the northeastern corner of Royce Area 410. The Commission found that this area was used and occupied by the Five Lodge Band of the Sisseton Sioux, who derived their sustenance mainly by hunting between Two Woods Lake and the James River.[17] In addition to contemporary documentary evidence referred to in the Commission's findings, the occupancy of the Five Lodge Band was supported by the testimony of defendant's expert witness, Mr. Alan R. Woolworth, an archeologist and the Museum Curator for the Minnesota Historical Society. The Commission therefore determined that the Yankton Sioux had failed to establish exclusive use and occupancy of this disputed area.

The Government claims that a large portion of the western side of Royce Area 410 was used by other tribes for a long period of time before the 1858 ces-

sion and that a large tract of about 2 million acres in the northern part of Royce Area 410 was not used or occupied exclusively by the Yanktons. The Government also contends that there was a nonexclusive area of about 1½ million acres lying between the lands of the Yankton Sioux Tribe and the Minnesota Sioux Tribe dwelling along the eastern part of Royce Area 410 and that an area of about 1 million acres in the southern part of Royce Area 410 should be eliminated since it was used and occupied solely by the Santee Indians. The United States relies, to a large extent, on the testimony of its expert witness, Mr. Woolworth. It was his opinion that the Yankton Sioux Tribe exclusively used and occupied only the south and central portions of Royce Area 410. However, the Commission found that there was documentary evidence which conflicts with his opinion. In its findings, the Commission summarized this documentary evidence, which showed that the Tetons had abandoned all use of Royce Area 410 by 1825; that the Yanktonais never made any permanent use of any part of Royce Area 410 and that, except for a permanent village occupied by the Sisseton Sioux in the excluded northeastern corner of Royce Area 410, the evidence did not sustain the defendant's contentions. With respect to the Government's claim that the southeast corner of Royce Area 410 was used by the Santee Sioux, the Commission found that this band was an integral part of the Yankton Sioux Tribe.

The determination as to what portions of Royce Area 410 was owned aboriginally by the Yanktons involved questions of fact. In addition to the testimony of expert witnesses, there was offered in evidence a substantial quantity of documentary evidence consisting of reports, journals, and letters written by explorers, traders, travelers, Indian agents, and military officers. In some instances

---

17. The Sisseton and Wahpeton Bands of Sioux Indians have filed an amicus curiae brief supporting this holding and stated that their petition in Docket 363 in the Commission asserts their claim to the same land in the northeastern corner of Royce Area 410.

the documentary evidence was in conflict with the testimony of the expert witnesses. Thus, it was a typical situation in which the Commission, as the trier of the facts, was the judge of the credibility of the witnesses and of the weight to be accorded the conflicting evidence. After a review of the record in the light of the contentions of the Yankton Sioux Tribe and the Government, we cannot say that the findings and conclusions of the Commission are without substantial support in the evidence.

In order to understand the basis for the appeal of the Docket 74 Sioux from the order (24 Ind.Cl.Comm. 208), it is necessary to review events which preceded this order. As previously stated in this opinion, the Commission on August 27, 1965, decided that the Treaty of Fort Laramie recognized title in the land covered by Article 5 thereof in the "Sioux or Dahcotah Nation." On January 17, 1967, the Commission ordered Dockets 74 and 332–C consolidated for the sole purpose of determining the respective interests of the three tribes in the Fort Laramie land. The Yanktons then argued that they had a compensable interest in the land, whereas the Docket 74 Sioux contended that the Fort Laramie land would have to be considered in context with all land held by the Missouri Sioux Tribe in 1851 and that, since Royce Area 410 amounted to no more than the Yanktons' proportionate part of the Sioux land, the Yanktons should not share in the Fort Laramie land. On December 2, 1970, the Commission determined that the Yanktons had a 17 percent interest and the Tetons an 83 percent interest in the Fort Laramie lands—all as described in this opinion, *supra*. However, by order of December 17, 1969, the Commission permitted the Docket 74 Sioux to intervene in Docket 332–C for the purpose of claiming aboriginal title to Royce Area 410. The Commission then decided in

24 Ind.Cl.Comm. 208 that the Docket 74 Sioux had no interest in Royce Area 410.

In the proceedings before the Commission, the Docket 74 Sioux presented no evidence showing that they had exclusive use and occupancy of ,any part of Royce Area 410. Instead, their contention made to the Commission and now to the court, is that the Yanktons, the Yanktonais, and the Teton Sioux were all part of a larger land-owning entity designated as the "Missouri Sioux" or the "Sioux Nation" and, therefore, that the Yanktonais and the Teton Tribes held an undivided interest in the land of the Yankton Sioux Tribe. In other words, the Docket 74 Sioux argue that the land-owning patterns of the "Sioux Nation" must be identical on both sides of the Missouri River, and that if the land-owning entity in the Fort Laramie lands is the Sioux Nation, it necessarily follows that the land-owning entity in Royce Area 410 is also the Sioux Nation, i. e., the Teton, Yanktonais, and Yankton Sioux.[18]

We agree with the Commission that this contention of the Docket 74 Sioux is fallacious, because it fails to recognize the legal distinctions between aboriginal title and recognized title. In reaching its decision as to which of the three tribes had recognized title to the Fort Laramie land, the task of the Commission was to determine the intent of Congress without regard to a showing of exclusive use and occupancy by any tribe for a long period of time. In contrast, the Commission decided that the Treaty of April 19, 1858 was not a treaty of recognition and that the claims of the Yankton Sioux Tribe and the Docket 74 Sioux to this area would have to be established by proof of aboriginal Indian title. 22 Ind.Cl.Comm. 344. Since the Docket 74 Sioux have introduced no evidence showing that their ancestors had

18. Before the Commission, the Docket 74 Sioux made the same contention with respect to Royce Area 411, a tract of 400,000 acres of land which was not ceded by the Treaty of April 19, 1858, but was expressly retained as a reservation for the Yankton Sioux, Royce Area 411 is not otherwise involved in this appeal.

aboriginal title to Royce Area 410, it follows that their appeal must be denied.

In view of the foregoing discussion, we hold that the cross-appeal of the Yankton Tribe of Sioux, the cross-appeal of the United States, and the appeal of the Docket 74 Sioux from the order entered in 24 Ind.Cl.Comm. 208 are denied and that the Commission's order is in all respects affirmed.

*The Government's Statute of Limitations Defense to 23 Ind.Cl.Comm. 419 and 24 Ind.Cl.Comm. 147*

 As previously stated in this opinion, the Commission in the first of the two orders cited above (decided August 26, 1970) held that the Teton and the Yanktonais Sioux, by reason of exclusive use and occupancy for a long time prior to 1869, had aboriginal title to a tract of land lying east of the Missouri River and between the James and Missouri Rivers. The decision resulted from a trial upon the Indians' amended petition in Docket 74-A which asserted claims for land ceded to the United States in the Treaty of April 29, 1868, ratified February 16, 1869 (15 Stat. 635). The claims were made on the grounds provided for in Clauses 3, 4 and 5 of Section 2 of the Indian Claims Commission Act. The Commission denied the Government's plea that the claims in the amended petition were barred by the statute of limitations (25 U.S.C. § 70k (1970)).

On August 12, 1965, the Commission decided that the Treaty of Fort Laramie of September 17, 1851 (11 Stat. 749, 2 Kapp. 594) recognized the title of the "Sioux or Dahcotah Nation" to a described territory of land lying west of the Missouri River (15 Ind.Cl.Comm. 577). The Commission's subsequent decision of December 2, 1970 (24 Ind.Cl. Comm. 147), held that the Teton and Yankton divisions of the Sioux owned an undivided 83 and 17 percent interest respectively in the Sioux portion of the Fort Laramie land. The Government has attacked these decisions on the ground that any claim of the Sioux based on the Fort Laramie Treaty was also barred by the statute of limitations.

The Government's statute of limitations defense to all of these orders of the Commission was finally denied in the Commission's Order of June 23, 1972 (28 Ind.Cl.Comm. 204).

In its cross-appeal here, the Government again urges that the claims of the Docket 74 Sioux, based on the Treaty of 1868, to any land east of the Missouri River and any claim for the value of land included in the 1851 Treaty of Fort Laramie are barred by the statute of limitations, as well as by the failure of the Docket 74 Sioux to include such claims in their appeal to this court in 1954.

A decision on the questions raised by the Government's cross-appeal requires a somewhat detailed discussion of proceedings in the Commission and in this court beginning with the original petition filed in the Commission in Docket 74 on August 15, 1950. In that petition, the Docket 74 Sioux pleaded that:

(a) the Sioux Indians aboriginally occupied a large area of land in the States of Minnesota, Iowa, South Dakota, North Dakota, Nebraska, Wyoming, and Montana;

(b) the United States recognized the title of the Teton Sioux to the territory defined in the Treaty of Fort Laramie;

(c) the United States and the Sioux agreed to the Treaty of April 29, 1868, 15 Stat. 635. The provisions of that treaty were set forth in *haec verba,* including the allegation that the Sioux had therein relinquished their claims to all land in the United States except for certain reserved areas;

(d) the United States acquired a portion of the Sioux lands by the Act of February 28, 1877, 19 Stat. 254. The provisions of that Act were pleaded in *haec verba* in the original petition;

(e) during the years 1873 to 1876, the defendant misappropriated more than seven million acres of land belonging to plaintiffs; the Government violated

many provisions of the Treaty of April 29, 1868, and some of the chiefs and less than ten of the adult male Sioux were coerced into ratifying the agreement of September 20, 1876, in violation of the provisions of the Treaty of 1868; and

(f) in spite of the fact that the Sioux agreement of September 20, 1876, was not signed by three-fourths of the adult male Indians as required by the Treaty of 1868, Congress made the agreement a part of the Act of February 28, 1877, 19 Stat. 254. That Act reduced the boundaries of the Sioux reservation as established by the Treaty of 1868 and provided that the Indians thereby ceded and relinquished to the United States all other territory lying outside the reduced reservation, including the hunting rights reserved in the Treaty of 1868.

In their prayer for relief, the plaintiffs sought recovery for the value of three tracts of land, including: (1) 7,345,157 acres of land, referred to as the Black Hills land and being part of the Sioux permanent reservation; (2) more than 25 million acres of land lying west of the Missouri River and included in the outer boundaries of the area covered by the Treaty of Fort Laramie of September 17, 1851; and (3) some 40 million acres of land lying west and north of the boundary lines of the Fort Laramie Treaty of September 17, 1851.

After a trial, which the Docket 74 Sioux say was completed in 2 hours and 20 minutes, the Commission dismissed the petition on April 5, 1954 (2 Ind.Cl. Comm. 646).[19]

An appeal was taken to the Court of Claims, and in its decision of November 7, 1956, which was limited to the Black Hills claim, the court unanimously affirmed the decision of the Commission. The decision was never reported in the official reports of the court but was reported in 146 F.Supp. 229.

On July 12, 1957, the attorney who had represented the Sioux died, and on October 4, 1957, the substituted attorney of record for the Indians filed with the court a motion to vacate the judgment of affirmance and to remand the case to the Commission "for a full and complete hearing and disposition on the merits of the claims set forth in the petition." In the motion, it was alleged that because of grossly incompetent legal representation, the tribal claims of the Sioux had been determined on the basis of a distorted and empty record; that the former attorney had agreed with the Government not to press two of the claims; that he made concessions which were contrary to fact; that he failed to conduct significant research; and that the Commission itself erred, as a matter of law, in failing to conduct an independent investigation into the facts of the case. In the supporting statement attached to the motion, the following was stated:

> Critical to this case are two major questions: first, what was the value of the property surrendered to the United States under the 1868 treaty and the Sioux agreement; and, second, what was the value of the consideration received by the Indians for their property? We agree the property should be valued as of the dates of acquisition.

The motion was opposed by the Government, but on November 5, 1958, the court entered an order reading in pertinent part as follows:

> IT IS ORDERED this fifth day of November 1958, that said motions for new trial and to vacate the judgment are granted to the extent that this case is remanded to the Indian Claims Commission pursuant to section 20(b) of the Indian Claims Commission Act, 60 Stat. 1054, for a determination by said Commission as to (1) whether the claimant Indian tribes are entitled on the basis of the statements made in support of the above motions to have the proof in this case reopened, and

19. Apparently the trial which was followed by this order of the Commission was limited to the claim for the value of approximately seven million acres in the Black Hills area, Def. Br. filed Nov. 15, 1957, in Appeal Docket No. 4–55 at pp. 4, 8.

(2) if so, to receive the additional proof sought to be offered and on the basis thereof, together with the record already made, reconsider its prior decision in this matter.[20]

From the foregoing two things are clear: first, the appellant Sioux gave notice that they intended, if the case should be remanded, to pursue their claims for the value of lands ceded or relinquished to the United States by the Treaty of 1868, and, second, that in its order of remand, the court authorized the Indian Claims Commission to reopen the entire case and receive the additional proof which the Sioux indicated would be offered on remand.

On November 19, 1958, the Commission ordered that the proof in the case be reopened for the purpose of receiving additional evidence, and on November 4, 1960, the Commission granted the motion of the Sioux to amend the original petition in Docket No. 74 by substituting two separate petitions to be designated as Dockets 74–A and 74–B. The amended petition in Docket 74–A was based upon the 1868 Treaty and, among other things, alleged that (a) in the Treaty of Fort Laramie, the United States recognized Sioux ownership to the territory described in Article 5 of that treaty; (b) notwithstanding the Fort Laramie Treaty, the United States permitted miners and other non-Indians to trespass upon the Sioux lands, thereby causing disputes which resulted in the Powder River War; (c) in the Treaty of April 29, 1868, 15 Stat. 635, the Sioux agreed in Article XI thereof to relinquish all their rights to occupy permanently the territory outside the reservation defined in that treaty but reserved the right to hunt on other lands; (d) the total value of the expenditures which the Government agreed to make under the Treaty of 1868 was less than the value to the Government of the obligations assumed by the Indians, without regard to the value of the land ceded. The prayer for relief was for the value of the territory and rights ceded to the United States under Article XI of the Treaty of April 29, 1868.[21]

The amended petition in Docket 74–B covered the Black Hills claim, encompassing approximately seven million acres allegedly taken by the Act of February 28, 1877, 19 Stat. 254.

On January 19, 1961, the United States filed a petition for mandamus in Appeals Docket No. 4–55, claiming that the Commission's Order of November 4, 1960, which permitted the Docket 74 Sioux to file the amended petitions, violated the court's order of remand of November 5, 1958. At the time it acted upon the Government's petition for a writ of mandamus, the court had before it the Commission's order reopening proof and the order authorizing the filing of the amended petitions, together with copies of the amended petitions. Among other things, the Government's petition for the writ of mandamus stated that the amended petition in Docket 74–A alleged a claim for aboriginal occupancy of land relinquished under Article XI of the 1868 Treaty and that this claim was barred by the statute of limitations, 25 U.S.C. § 70k. The court denied the Government's petition for writ of mandamus by order dated February 6, 1961.

In Snoqualmie Tribe of Indians v. United States, 372 F.2d 951, 178 Ct.Cl. 570 (1967), this court considered the question of when a claim is presented within the 5-year period specified in 25 U.S.C. § 70k in connection with Rule

20. For a summary of proceedings, *see* Sioux Tribe of Indians, 182 Ct.Cl. 912 (1968).

21. In a series of procedural orders issued after the amended petition in Docket 74–A was filed, the Commission struck the amended petition but directed that the issues to be tried under the original petition would include the land and interests ceded by the Treaty of April 29, 1868. The Docket 74 Sioux state that these procedural orders effected the same result as if the amended petition in Docket 74–A had been allowed to stand, and the Government apparently agrees with this view.

13(c) of the Indian Claims Commission. In that case the court stated:

Thus notice is the test, and it is built-into the rule's requirement that the amended pleading arise out of the same "conduct, transaction, or occurrence." * * * In other words, the inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading. 372 F.2d at 960, 178 Ct.Cl. at 587.

The decision in that case was handed down some 6 years after the court's denial of the Government's petition for a writ of mandamus. Although the facts in the *Snoqualmie* case are admittedly different from those before us, it is clear that the original petition which the Docket 74 Sioux filed alleged that Article 5 of the Fort Laramie Treaty of September 17, 1851, recognized the right and title of the Teton or Western Sioux to a large area of land, including the Black Hills. The original petition also shows that the Indians sought recovery for lands designated as Class B lands, which were included in the outer boundaries of the Treaty of Fort Laramie. The original petition in Docket 74 also set out in *haec verba* the essential provisions of the Treaty of 1868, including Article XI thereof, which provided for relinquishment by the Indians of all rights to occupy previously unceded territory outside of their reservation except for certain reserved hunting rights. The territory relinquished by the Treaty of 1868 included land both east and west of the Missouri River and specifically the land that was covered by the Commission's decision of August 26, 1970, 23 Ind.Cl.Comm. 419. The original petition also alleged how the Treaty of 1868 was violated by the United States in many ways.

We acknowledge that the question as to whether the claims included in the amended petition in Docket 74–A relate back to the claims covered by the original petition, within the rationale of the *Snoqualmie* case, is a difficult one. If

we had been members of the court which issued the order of November 5, 1958, and denied the petition for mandamus in 1961, it is possible that we might have reached a different result. However, we resolve the doubt in favor of the Docket 74 Sioux on the ground that in the more than 10 years that have since elapsed, both the Docket 74 Sioux and the Commission have relied on these orders of the court, and a great deal of time, work, and money have been expended on that reliance. Under the circumstances, we think it would be unconscionable for us to set aside the 1958 and 1961 orders of the court in a situation where there is a doubt as to how the question of law should be decided. The adoption of the Government's position would, of course, require us to repudiate those orders. For these reasons, the Government's cross-appeal on this issue is hereby denied.

*The Government's Cross-Appeal From 27 Ind.Cl.Comm. 79*

■ This cross-appeal involves an order which allowed the Docket 74 Sioux to file an amended petition on March 8, 1972. The amended petition is a result of the appellant's dissatisfaction with the Commission's holding (24 Ind.Cl. Comm. 147) that the Teton Sioux had an 83 percent recognized title interest in the Fort Laramie Treaty lands and that the Yankton Sioux held the remaining 17 percent title interest in the lands.

The amended petition is based on the claim that the Docket 74 Sioux had aboriginal title to all of the land covered by the treaty of Fort Laramie and that when the United States recognized title in that treaty in the "Sioux or Dahcotah Nation," as interpreted by the Commission, the United States thereby took 17 percent of the land to which plaintiff's ancestors had aboriginal title. In the challenged Order of March 8, 1972, the Commission permitted the Docket 74 Sioux to file the amended petition over the objections of the United States that the claim was barred by the statute of limitations and that if the Indians were

allowed to recover thereon, it would subject the Government to double liability. We agree that the amended petition is clearly barred by the statute of limitations, 25 U.S.C. § 70k (1970).

In many decisions dealing with the Treaty of Fort Laramie, it has been held that the Treaty of Fort Laramie was not a treaty which took any land from the Indians but instead was a treaty which recognized the title of certain signatory tribes on the basis of the territory which they used and occupied. Crow Tribe of Indians v. United States, 284 F.2d 361, 364–371, 151 Ct.Cl. 281, 285–297 (1960), cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961); Indians of the Fort Berthold Indian Reservation v. United States, 71 Ct.Cl. 308 (1930).

More to the point, the Treaty of Fort Laramie has since the very beginning of this litigation in 1950 and continuing down to 1972 been acknowledged by the Commission and by all the parties to the litigation as a treaty of recognition. It was so alleged in the petition filed in Docket 74 on August 15, 1950, and in each of the amended petitions filed November 4, 1960. Prior to 1972, the Docket 74 Sioux had never given any notice nor had they even intimated that they were asserting a claim on any ground other than that the 1851 Treaty was a treaty of recognition. This complete reversal of position by the Docket 74 Sioux and their attempt to recover on a theory which is wholly inconsistent with that upon which they have proceeded throughout the litigation is more than 20 years too late. Under the most liberal application of our decision in the *Snoqualmie* case, the claim is barred by the statute of limitations. The fact that the Yankton Sioux may recover the value of a part of the land covered by Article 5 of the Treaty of Fort Laramie is not the fault of the Government; it is the result of the Commission's interpretation of the treaty. The Commission's interpretation is not the kind of transaction or occurrence that generates a cause of action that can be said to relate back to the claims alleged in the original petition. Reynolds Metals Co. v. United States, 438 F.2d 983, 987, 194 Ct.Cl. 309, 316, cert. denied, 404 U.S. 825, 92 S.Ct. 55, 30 L.Ed.2d 54 (1971). Accordingly, the orders of the Commission to the contrary are hereby reversed and, on remand, the Commission is directed to dismiss the amended petition.

Affirmed in part, reversed in part, and remanded.

DAVIS, Judge (concurring):

I join unreservedly in all of the Chief Judge's opinion except for the discussion, under the heading "Appeal from 24 Ind.Cl.Comm. 147", of the two questions of (i) the Commission's exclusion of the Yanktonais from the benefits of the 1851 Treaty of Fort Laramie and (ii) of the apportionment of respective interests in the Fort Laramie land. On the first of those issues, I am much more in doubt than is the Chief Judge, and my uncertainty on that question could lead, but not necessarily, to a somewhat different slant on the second topic.

The inclusion or exclusion of the Yanktonais from the coverage of the Fort Laramie Treaty is an exceedingly close question. Like the Chief Judge, I see the treaty as unclear on its face, to be properly read only in the light of its background and history. I agree, too, that the issue is one of law for the court. The Chief Judge's opinion marshals a good case for the position that the Yanktonais were not beneficiaries of the document. I think that a good case can likewise be made for the opposing view, and I shall sketch it here.

The main positive factors favoring the Yanktonais are these: The treaty term "Sioux or Dahcotah" is admittedly comprehensive enough to cover the Yanktonais, as well as the Teton and Yankton, and on its surface would seem to include them all. Since the treaty was one of peace as well as of recognition, it would not be untoward for the Federal Government to deal with the entire nation—or at least with that half of it which lived anywhere near the affected territory.

Moreover, the 1853 treaty amendment was signed by Indians identified in the instrument as "Sioux of the Platte" and "Sioux of the Missouri"—and the concept of "Missouri Sioux" always included the Yanktonais. In 1853, Agent Vaughn of the Upper Missouri Agency contemporaneously wrote as if there were no doubt the Yanktonais were covered by the Fort Laramie treaty; the Chief Judge discounts this letter, but I give it much more importance because it was written immediately after the Indians' acceptance of the 1853 amendment by a very knowledgeable government official right on the spot. Annuities appear to have been paid thereafter, under the treaty, to the Yanktonais along with the other Missouri Sioux.

The negative factors are, of course, not at all unsubstantial, but it is possible to explain them away (just as the proponents of Yanktonais exclusion can explain away the affirmative elements I have just outlined). The reference in the treaty preamble to the "following Indian nations, residing south of the Missouri River" could mean no more than that the "Sioux or Dahcotah" group resided *in part* south of the river, in the same way that a pact between Canada and the United States about Pacific fisheries could describe both countries as occupying the North American Pacific coastal region. The same can be said of the pre-treaty references in reports and communications to the "Sioux south of the Missouri river" and like observations. The fact that no Yanktonais chiefs signed the treaty (or its amendment) [1] loses much significance when one recalls that no chiefs of two of the seven Teton bands—separate units since the Teton were not a unified political entity—signed either document, and no Sioux representatives to either instrument were identified on the papers as representing or belonging to the Yankton or Teton or any other subgroup

(except, as I have noted, in the amendment the signers were characterized as "Sioux of the Platte" and "Sioux of the Missouri"). The method of signature is consistent with the theory that the signers represented all of the Sioux nation, or at least its middle and western branches. By the same token that the treaty was made on behalf of the nation, it need not be decisive that the Yanktonais appear not to have lived on the Fort Laramie land (see note 2, *infra*).

I set forth this summary of the case supporting the Yanktonais because I have found the issue harder than indicated in the Chief Judge's discussion, and might decide the other way if I were the only one to judge. However I concur in the Chief Judge's result on this point for two reasons. Although the question is a legal one, on which I am not at all bound by the Commission's decision, I am much influenced, where the balance teeters so evenly, by the fact that the five members of the Indian Claims Commission unanimously came to the same view as the Chief Judge. Secondly, Judge Skelton's dissent on the limitations defense means that, as to recovery for the Fort Laramie land, the judges of this panel would be divided three different ways if I were to vote to cover the Yanktonais as well as the Teton and Yankton. Since I agree fully with the Chief Judge on limitations, and since I find the choice of inclusion or exclusion for the Yanktonais to be so close and difficult, I believe that I should accept his view in order to have a functioning majority of the court as to the recovery for the Fort Laramie land and to enable a judgment to be entered on that point. *Cf.* Wilkinson v. United States, 304 F.2d 469, 476, 157 Ct.Cl. 847, 862 (1962).

I append a few words on the apportionment problem. If the Yanktonais were to be included, I would divide the interests of the three groups (Yankton,

1. I accept the historical evidence that in fact no Yanktonais participated in the treaty deliberations. Since the issue is one of treaty interpretation, I do not treat the testimony of the opinion witnesses on the coverage of the treaty as "evidence" although, of course, their views must be given weight as experts in the general field.

Teton, and Yanktonais) on the basis of total population since, on that view, the treaty recognition would go to all the Missouri Sioux in common and not to those who actually lived south and west of the Missouri.[2]

On the other hand, if only the Yankton and the Teton are covered by the Fort Laramie treaty—a position in which I ultimately concur, as indicated above—then the Chief Judge's solution of the apportionment question seems to me correct in theory, and I join in it, as I join in his rejection of the Docket 74 Sioux' assault on the Commission's population figures.

SKELTON, Judge (concurring in part and dissenting in part):

I concur with the opinion of the majority in awarding that part of Royce 410 to the Yankton Tribe that the majority opinion describes; and also the decision of the majority that the claim of the Docket 74 plaintiffs, first asserted in their amended petition of March 8, 1972, that the 1851 Treaty of Fort Laramie had taken 17 percent of their land south and west of the Missouri River and given it to the Yankton Tribe was barred by limitations because it was filed more than 20 years too late. I also agree with the majority in denying recovery to all plaintiffs of Royce 411 and the "no man's land" in the northeastern and northwestern corners of Royce 410. I cannot agree with the remaining part of the majority opinion because all of the other claims of all of the plaintiffs are clearly barred by the statute of limitations, because they were first allowed in the pleadings by the Commission more than 18 years too late. The Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C. § 70 et seq., enacted August 13, 1946, required all claims of Indian Tribes to be filed with the Indian Claims Commission within five years, i.

e., prior to August 13, 1951. Except for the claims of the Yankton Tribe to Royce Area 410, which was set forth in a separate suit, Docket 332A, filed by it within the limitation period, which was later consolidated with this suit, (Dockets 74 and 332C) all of the other claims of the Docket 74 plaintiffs (Tetons and Yanktonais) were allowed by the Commission to be pleaded the first time by the Tetons in their plea in intervention in the Yankton suit (Docket 332C) on December 17, 1969, more than 18 years after the statute of limitations abovementioned had barred their claims. These claims that were barred by limitations consisted of claims based on the alleged wrongful taking of their lands by the Government under the Treaty of April 29, 1868; claims of alleged aboriginal Indian title to lands west of the Missouri River outside their reservation; claims to 14.3 million acres of land east of the Missouri River based on aboriginal title; claims to Royce 410 and 411, and claims on behalf of the Yanktonais to land on both sides of the Missouri River based on aboriginal title, even though the Yanktonais were not plaintiffs in the original petition and have never been a party to this suit. None of these claims were included in the original petition filed in this case on August 15, 1950, all of which will be pointed out in detail below.

This suit was filed by seven tribes of the Teton Sioux Indians (Tetons) on August 15, 1950. The plaintiff tribes who signed the original petition were the following:

The Sioux Tribe of the Rosebud Indian Reservation in the State of South Dakota.

The Sioux Tribe of the Standing Rock Indian Reservation in the States of South Dakota and North Dakota.

2. I concur that there is now no proof in the record that the Yanktonais lived in that area in substantial numbers, and that it is too late for the Docket 74 Sioux to try to show that they did. I would also reject the notion, which appears to be advanced at times by the Docket 74 Sioux, that the Yankton had no interest in the Fort Laramie land even if the Yanktonais are included.

The Sioux Tribe of the Pine Ridge Indian Reservation in the State of South Dakota.

The Sioux Tribe of the Cheyenne River Indian Reservation in the State of South Dakota.

The Sioux Tribe of the Crow Creek Indian Reservation in the State of South Dakota.

The Sioux Tribe of the Lower Brule Reservation in the State of South Dakota.

The Sioux Tribe of the Santee Indian Reservation in the State of Nebraska.

The Sioux Tribe of the Fort Peck Indian Reservation in the State of Montana.

It should be emphasized that the Yanktonais were not plaintiffs in the original petition either by name or in a representative capacity. This is important on the limitations question with regard to the claim of the Yanktonais and Tetons to 14.3 million acres east of the Missouri River which will be discussed more fully below.

In order to show beyond question that the above mentioned claims of the Tetons are barred by the five year statute of limitations of the Indian Claims Commission Act cited above, it is necessary to show not only what claims were asserted in their original petition, but also the claims now asserted that were *not* included in their original petition. This showing will now be made as follows.

The Tetons (eight named tribes which did not include the Yanktonais or the Yanktons) alleged in their original petition that under the terms of the Treaty of Fort Laramie of September 17, 1851 (11 Stat. 749) they were given recognized title by the Government to the following described land:

The territory of the Sioux or Dahcotah Nation, commencing the mouth of the White Earth River, on the Missouri River, thence in a south-westerly direction to the forks of the Platte River; thence up the north fork of the Platte River to a point known as the Red Bute, or where the road leaves the river; thence along the range of mountains known as the Black Hills, to the head-waters of Heart River; thence down Heart River to its mouth; and thence down the Missouri River to the place of beginning.

It will be noted that all of this land was *west* of the Missouri River and *the title thereto was based on recognized title and not on aboriginal title.*

The original petition of the Tetons further alleged that another treaty was made by them with the Government on April 29, 1868 (15 Stat. 635) and under the terms of that Treaty, they relinquished "all claims or right in and to any portion of the United States or Territories, except such as is embraced within the limits aforesaid [within their reservation] and except as hereinafter provided * * *," in consideration of the creation by the Government of a reservation for them consisting of the following described lands, and other described consideration:

Article II. * * * [C]ommencing on the east bank of the Missouri river where the forty-sixth parallel of north latitude crosses the same, thence along low-water mark down said east bank to a point opposite where the nothern line of the State of Nebraska strikes the river, thence west across said river, and along the northern line of Nebraska to the one hundred and fourth degree of longitude west from Greenwich, thence north on said meridian to a point where the forty-sixth parallel of north latitude intercepts the same, thence due east along said parallel to the place of beginning; and in addition thereto, all existing reservations on the east bank of said river * * *.

The Tetons alleged further in their original petition that they agreed in the 1868 Treaty that

483

Article XI. * * * [T]hey will relinquish all right to occupy permanently the territory outside their reservation as herein defined, but yet reserve the right to hunt on any lands north of North Platte, and on the Republican Fork of the Smoky Hill river, so long as the buffalo may range thereon in such numbers as to justify the chase. * * *

In Article XVI of the 1868 Treaty, it was further agreed:

* * * [T]he country north of the North Platte river and east of the summits of the Big Horn mountains shall be held and considered to be unceded Indian territory, * * *.

The Tetons further alleged in their original petition that by reason of the Treaty of 1868 they had the following recognized titles:

Class A. All of that area lying between the 43rd and 46th standard parallels east of the 104th meridian and west of the 103rd meridian and the forks of the Cheyenne River. To this area, comprising 7,345,157 acres, the plaintiffs had an absolute fee title,— being part of the Permanent Reservation.

Class B. All of that area lying west of the Missouri River and included in the outer boundaries laid down by the treaty of September 17, 1851, exclusive, however, of the area described as the permanent reservation of the Sioux Tribe of Indians by Article II of the treaty of April 29, 1868. To this area, comprising 25,858,594.95 acres, the plaintiffs had the absolute and exclusive right to the undisturbed use and occupation.

Class C. All of that area lying to the west and north of the boundary lines laid down by the treaty of September 17, 1851, as far west as the Big Horn Mountains and as far north as the Missouri River. That plaintiffs exercised their right to roam over and hunt on this area continuously subsequent to 1851, as they actually had done prior thereto. That this

area of land comprises 40,578,123.25 acres. That said right to roam over and hunt on said land was a valuable right and that plaintiffs by their occupation of this particular area secured and maintained a right recognized by defendant. (See Art. XI of said treaty of 1868.)

It should be noted that all of the land described in the Treaty of 1868 to which the Tetons claimed recognized title was located *west* of the Missouri River, except "all existing reservations *on the east bank* of said river." (Emphasis supplied.)

The original petition of the Tetons alleged that during the years 1873 to 1876 the Government ejected them from the Black Hills area of their reservation that was set aside for them in the Treaty of 1868, consisting of 7,345,157 acres. They alleged that the ejection was wrongful and was made permanent by the United States Congress when it enacted the law of February 28, 1877, 19 Stat. 254. This statute took the Black Hills area from the Tetons and redefined the boundaries of their reservation as follows:

Article I. * * * [T]he northern and western boundaries of the reservation defined by article 2 of the treaty between the United States and different tribes of Sioux Indians, concluded April 29, 1868, and proclaimed February 24, 1869, shall be as follows: The western boundaries shall commence at the intersection of the one hundred and third meridian of longitude with the northern boundary of the State of Nebraska; thence north along said meridian to its intersection with the South Fork of the Cheyenne River; thence down said stream to its junction with the North Fork; thence up to the North Fork of said Cheyenne River to the said one hundred and third meridian; thence north along said meridian to the South Branch of Cannon Ball River or Cedar Creek; and the northern boundary of their said reservation shall follow the said South Branch to its intersection

with the main Cannon Ball River, and thence down the said main Cannon Ball River to the Missouri River; * * *.

The Statute of 1877, enacted after an agreement had been reached with the Tetons, further provided:

* * * [A]nd the said Indians do hereby relinquish and cede to the United States all the territory lying outside the said reservation, as herein modified and described, including all privileges of hunting; and article 16 of said treaty [of 1868] is hereby abrogated. .

The Tetons alleged in their original petition that by passing the law of 1877, the Government took certain of their lands guaranteed to them by the Treaties of 1851 and 1868 without paying adequate compensation therefor. They sued for such compensation based on the alleged unlawful taking by the Government in enacting the statute of 1877. Not one word appears in the original petition about any unlawful taking by the Government of lands of the Tetons under the Treaties of 1851 or 1868, and no notice whatever was given to the Government that they would ever claim a wrongful taking under those Treaties, as required by Snoqualmie Tribe of Indians v. United States, 372 F.2d 951, 178 Ct. Cl. 570 (1967). The entire complaint of the Tetons was based on the taking of their lands under the Act of 1877. To demonstrate that this is true beyond any question, I quote the concluding numbered paragraph of the original petition of the Tetons with the caption *"Recovery Due Plaintiffs"* (Emphasis supplied) as follows:

The plaintiffs say they are entitled to payment for their lands on the basis of fair and honorable dealings.

They are entitled to a reasonable portion of the value of the gold, silver, and other minerals which have been produced in the Black Hills area.

They are entitled, as a minimum, to payment for timber lands at the rate the United States charged and received from timber and stone entrymen, or a fair stumpage rate for timber.

They are entitled to payment for farming and grazing lands at the rate charged by the United States to homesteaders under preemption acts.

They are entitled to payment for the loss of their roaming and hunting rights at a fair and reasonable rate *from 1877,* through the following years, and down to the time when wild game no longer "justified the chase."

Plaintiffs therefore claim from defendant, on information and belief as follows:

1. *Royalties.* A fair and reasonable percent of the value of gold, silver and other minerals extracted from the Black Hills lands *from February 28, 1877,* down to the date of settlement of this claim, less any deductions which this Honorable Commission may allow under the terms of the Act of August 13, 1946, *supra,* together with a continuing royalty on the value of the annual extraction of gold, silver and other minerals or the commuted value thereof.

2. *Timber.* Payment of at least $2.50 per acre for all timber lands in Class A (within the 1868 Permanent Reservation)—7,345,157 acres—together with interest thereon *from February 28, 1877,* to the date of settlement of this claim.

3. *Unceded Lands.* Payment of at least 50 cents per acre for unceded lands, Class B (outside the 1868 Permanent Reservation but declared to be unceded by the 1868 Treaty)—25,-858,594.95 acres—together with interest thereon *from February 28, 1877* to the date of settlement of this claim.

4. *Hunting Lands.* Payment of at least 10 cents per acre for hunting lands, Class C—40,578,123.25 acres—together with interest thereon *from February 28, 1877,* to the date of this claim.

WHEREFORE, the premises considered, plaintiffs pray:

That this petition be considered by the Indian Claims Commission and be reported to the Congress in favor of the plaintiffs in the amount established by the evidence and as hereinbefore set out.

For such other and further relief as to the Commission may seem just and proper in the premises. [Emphasis supplied.]

The original petition of the Tetons is important on the question of limitations not only for the claims *that it contains,* but also, and more importantly, for the claims *it did not contain,* but which are now being asserted 18 years after they are barred by limitations.

In summary, the following claims were asserted by the Teton plaintiffs in their original petition:

1. Claims *only* by the eight Teton Sioux Tribes named above whose names are subscribed to the petition.

2. Claims *only* for the taking of their property by Act of Congress of February 28, 1877, as follows:

 (a) For farming, grazing, timber, hunting, and mineral lands *taken in 1877,* including the Black Hills area of 7,345,157 acres.

 (b) For loss of roaming and hunting rights *from 1877* to the time when wild game no longer "justified the chase."

 (c) For a fair and reasonable per cent of the value of gold, silver, and other minerals (royalties) extracted from the Black Hills lands *from 1877* to date, with continuing royalties in the future.

 (d) For $2.50 per acre for all timber lands in Class A described above (7,345,157 acres in the Black Hills area), with interest *from February 28, 1877* to date.

 (e) For 50 cents per acre for 25,858,594.95 acres of unceded lands (Class B described above) outside of the 1868 permanent reservation, together with interest *from February 28, 1877* to date.

 (f) For 10 cents per acre for hunting lands (Class C described above) of 40,578,123.25 acres, with interest *from February 28, 1877* to date.

3. *All* of the claims were based on recognized title under the Treaties of 1851 and 1868.

4. *All* of the claims were made with reference to land *west and south* of the Missouri River.

The following claims now being asserted were *not* contained in the original petition of the eight Teton Sioux Tribes and are clearly barred by limitations:

1. All claims of the Yanktonais, who were not parties to the original petition either in person, by name or in a representative capacity. They are not now and never have been parties to this suit.

2. No claim of *aboriginal title* to any land whatsoever was in the petition. All claims were based on *recognized title.*

3. There was no claim whatever to any land *east* of the Missouri River.

4. The 14.3 million acres east of the Missouri River being awarded to the Tetons and Yanktonais was not claimed nor mentioned in any way.

5. No claim of any kind was made in the petition for any wrongful taking of property by the Government under the Treaties of 1851 and 1868, or either of them.

6. The Yankton Tribe was not a party plaintiff in the original petition by name or in a representative capacity. (It filed a separate suit only with reference to their claim to Royce 410 east of the Missouri River, Docket 332A).

7. The claim of the Yankton Tribe to lands west and south of the Missouri River based on aboriginal title, or recognized title under

the Treaties of 1851 and 1868, or either of them, was not in the original petition.

8. The Teton plaintiffs made no claim whatever to Royce 410 east of the Missouri River in their original petition.

It is clear from the foregoing facts that the claims for compensation of the Tetons that were alleged in their original petition, filed in 1950, were made solely and exclusively on the basis that the Congress in enacting the Act of February 28, 1877, took their property west and south of the Missouri River without the payment of adequate consideration. If they can prove these allegations, they are entitlted to appropriate compensation. However, in this proceeding we are not concerned with claims under the Act of 1877, as far as limitations is concerned, because those claims are not barred and are not before us, and they are to be litigated in Docket 74A which was separated from this suit by the Commission.

We are concerned with the claims listed above now being asserted by the plaintiffs that were not contained in the original petition of the Tetons. The most important of those claims are those that contend that there was a taking of plaintiffs' property by the Government under the Treaty of 1868 for which adequate compensation was not paid. I have shown by the contents of the petition itself that no such claim was contained therein, and no notice was given to the Government within the meaning of Snoqualmie Tribe of Indians v. United States, *supra,* that any such claim would be made. It is true that the Tetons described the provisions of the Treaties of 1851 and 1868 in the body of their original petition, as pointed out by the majority. However, it is clear that this was done to show they had recognized title to the land described in those treaties. They were merely pleading their title just as a landowner who has been ejected from his land would plead his deeds to the land in his ejectment suit. In such a case, the landowner

would not and could not assert a cause of action for ejection based on his deeds. His cause of action would be based on the act of ejectment that ousted him from the land conveyed to him by the deeds. In like manner, the Tetons in the instant case pleaded their recognized title in their original petition by alleging the contents of the Treaties of 1851 and 1868, but their complaint for "ejectment" or unlawful taking of their property was the act of "ejectment" by the passage of the law of 1877 and acts of the Government incident thereto.

The court expressed the situation very well in Blackfeet and Gros Ventre Tribes v. United States, 119 F.Supp. 161, 162, 127 Ct.Cl. 807, 812 (1954), cert. denied, 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 658 when it said:

> * * * Appellants' *right to the land* was given them by the treaty of 1855, but their *claim for just compensation* arose from the taking of the land in 1874. * * * The treaty in and of itself did not give rise to a claim for anything. * * * [Emphasis in original.]

*See also,* Baltimore Steamship Co. v. Phillips, 274 U.S. 316, 321, 47 S.Ct. 600, 602, 71 L.Ed. 1069 (1927) in which the Supreme Court said:

> A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show. * * * The facts * * * do not constitute the cause of action, but they show its existence by making the wrong appear. * * *.

So it is here. The 1851 and 1868 Treaties were facts showing the right of the Tetons to the land, but their claim for just compensation arose from the taking of the land in 1877.

Events that occurred after the filing of the original petition show that no claim was made for a taking under the Treaties of 1851 or 1868. When this case was first tried by the Commission, the Tetons introduced no evidence of a taking under either of these Treaties. All of the evidence of wrongful taking

was with reference to the Act of 1877. After the Commission ruled against them and dismissed their petition, the Tetons appealed the case to this court. In a well-reasoned opinion, the court affirmed the dismissal of the case by the Commission. That opinion showed in no uncertain terms that the claims of the Tetons was based entirely on the Act of 1877. *See* Sioux Tribe of Indians v. United States, 146 F.Supp. 229 (Ct.Cl. 1956). In that case the court stated in describing the claim of the Tetons:

> This is an appeal by the Sioux Tribe of Indians from an order of the Indian Claims Commission Docket No. 74 dismissing appellant's petition alleging that it was unconscionably compensated by defendant for 7,345,157 acres of its permanent reservation, more commonly known as the Black Hills, *taken from it by the appellee pursuant to the Act of February 28, 1877, 19 Stat. 254.* * * * [Footnote omitted] [Emphasis supplied.] [*Id.* at 231.]

It is true that in that opinion the Treaties of 1851 and 1868 were mentioned by the court but only for the purpose of showing the recognized title of the Tetons. There was no intimation nor notice whatever that they were claiming or would ever claim any taking of their property by the Government under either Treaty. The court pointed out that the Government had paid the Tetons under the Act of 1877 the sum of $57,048,106.00 as of 1953, and would continue to pay them $750,000.00 for many years to come, and because of these payments they had been adequately compensated. The attorney who tried the case for the Tetons admitted this was true.

On November 5, 1957, the court, without opinion, remanded the case to the Commission for a determination as to whether or not proof should be reopened, and, if so, to receive such proof and reconsider its prior decision. It was clear that in remanding the case under these circumstances the court contemplated that the Commission would consider whether or not proof should be reopened as to the taking of the property of the Tetons by the Act of 1877 and whether adequate consideration had been paid to them for the Black Hills area and such other property as was taken by that Act, as nothing else was before the court in that appeal. Nevertheless, after the Commission reopened the case for additional proof on November 19, 1958, the Tetons attempted to amend their original petition of 1950 by alleging a wrongful taking under the Treaty of 1868. The Government then asked this court to issue a writ of mandamus ordering the Commission to confine any additional proof to the allegations in the original petition. The petition for mandamus was denied by one judge of the court who endorsed the word "denied" thereon. No opinion was written and there was no showing that any issue in the case was considered or decided by the whole court. Under these circumstances, it is evident that nothing pertaining to the issues in the case was decided by the court. The petition could have been denied by the one judge for any number of reasons, perhaps procedural in character. But the Commission took this action to mean that the denial of the petition for mandamus was the law of the case and the Tetons could thereafter claim a wrongful taking occurred under the 1868 Treaty even though such a claim was not included in their original 1950 petition. This was clearly wrong. A similar situation confronted the court in Raylaine Worsteds, Inc. v. United States, 146 F.Supp. 723, 137 Ct.Cl. 54 (1956). In that case the court overruled *without opinion* defendant's motion to dismiss plaintiff's petition on certain grounds alleged by defendant. The plaintiff contended that this action by the court was "the law of the case" and the defendant could never again raise the issues stated in its motion to dismiss. The court ruled against the plaintiff, stating:

> It is the position of this court that the order it entered * * *, overruling the defendant's motion to dis-

miss, does not constitute the "law of the case" and does not preclude the court from now rendering a decision on * * * [the issue] after a hearing on the merits. [*Id.* at 726.]

So it was in the instant case. The denial of the petition for mandamus was not the law of the case, and it did not authorize the Commission to "throw the gates wide open" and allow the filing of an amended petition and proof for compensation for an alleged wrongful taking under the Treaty of 1868 that had long since been barred by limitations.

The Commission's interpretation of our decision in the *Snoqualmie* case, *supra,* and of the limitations provisions in the Indian Claims Commission Act, was so wrong and so liberal that for all practical purposes it nullified and rendered inoperative the statute of limitations. This is clearly shown in its opinion of March 8, 1972, in Docket 74, 27 Ind.Cl. Comm. 79, 82, in which it allowed the Tetons at that late date to amend its 1950 original petition so as to claim a wrongful taking under the Treaty of 1851, when it said:

> It is our opinion that the original petition in Docket 74 placed the defendant on notice that the plaintiffs *might* expand their claim to include lands lost under the Fort Laramie Treaty [of 1851]. Therefore, the proposed amendments relate back to the original petition, and the claim stated in these amendments was "presented" to the Commission prior to August 13, 1951. [Emphasis supplied.]

In the first place, the above statement shows that the claim was not in the original petition. In the next place, the holding that notice was given that the plaintiffs *might* put the claim in their pleadings by amendment 20 years later is entirely too nebulous and speculative as a proper interpretation of the statute of limitations. The same reasoning and far-fetched philosophy was used by the Commission when it allowed the Tetons to amend their original petition in 1969, by their plea in intervention, to claim a wrongful taking under the Treaty of 1868. Under such a view, limitations has little if any meaning in Indian cases. We indicated in *Snoqualmie,* whether wrongly or rightly in view of the discussion, *infra,* that notice given in the original petition to the Government was important on the question of limitations. Even so, there was no notice to the Government in the original petition in the instant case either expressly, directly, indirectly, inferentially or by implication that the plaintiffs would ever assert a claim for wrongful taking under the Treaty of 1868. There was no dissatisfaction, grievance, nor complaint whatever expressed in the original petition about the 1868 Treaty. A detailed and careful reading of the original petition, the essential portions of which are quoted above, shows without question that all of this is true. The decision and plan to assert a claim under the 1868 Treaty was dreamed up by the Tetons and first presented in 1960, nine years after limitations had barred such a claim, when they first attempted to amend their original petition. This was the *first* notice of any kind that they gave to the Government that they intended to claim a wrongful taking under the 1868 Treaty.

It may be that our opinion in the *Snoqualmie* case led the Commission into error on the question of limitations in the present case. If so, perhaps we should reconsider that opinion on this question. In any event, the limitation period in the Indian Claims Commission Act is definite, unambiguous and unequivocal. The Act provides:

§ 70k. Limitation of time for presenting claims.

The Commission shall receive claims for a period of five years after August 13, 1946, and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress. [25 U.S.C. § 70k (1964)]

It is clear that the Act does not contain any provision that authorizes an Indian Tribe to give notice that sometime in the future, after the limitation period has expired, there is a possibility that it *might* file a different claim. The Act provides in no uncertain terms that any claim existing prior to August 13, 1946, must be filed within five years (*i. e.*, before August 13, 1951); and if it is not filed within that period, it cannot thereafter be submitted to any court, administrative agency, or Congress for consideration. There is no doubt about the fact that Congress intended to cut off all claims not filed before August 13, 1951, and the Act so provides in clear and unmistakable language. The Commission did not follow the statute in the instant case.

The attorneys for the Tetons were apparently convinced, and correctly so, that the original petition did not allege a claim for wrongful taking under the Treaty of 1868 and that such an allegation was necessary. This is shown by the fact that they tried three times to amend the original petition to allege a claim under the 1868 Treaty, and each time the Commission rejected the amendment. In this regard, the record shows that the Tetons filed their first motion to amend on May 11, 1960 (over eight years after the claim was barred by limitations). The Commission allowed the amendment, but struck it as to the 1868 Treaty on January 30, 1962. On February 28, 1962, the Tetons filed their second amended petition claiming a wrongful taking under the 1868 Treaty. The Commission struck this amendment on April 5, 1962. *Six years later*, on March 6, 1968, the Tetons filed their *third* amended petition, claiming compensation under the 1868 Treaty (over 16 years after such claims were barred by limitations). The Commission, on October 29, 1968, again denied this third effort of the Tetons to amend their 1950 petition. Being thus frustrated in their three attempts to claim a wrongful taking under the 1868 Treaty by amendments to their 1950 petition, the Tetons resorted to other means to allege claims under the 1868 Treaty and *finally* succeeded when on December 17, 1969, the Commission allowed the Tetons to intervene in the suit of the Yanktons with reference to Royce Area 410 (Docket 332A) in which plea in intervention the Tetons included claims under the 1868 Treaty. The Commission allowed these claims to be made, it seems to me, out of frustration, confusion, or utter exhaustion. The gates were opened wide for the Tetons to claim whatever land, under whatever treaty, for whatever Indian Tribe, under whatever title, that they desired, notwithstanding the fact that these claims had been barred by limitations for 18 years. The Tetons lost no time in taking advantage of this opportunity to present their barred claims "through the back door." In their plea in intervention, they were allowed for the *first time* to allege in pleadings filed with the Commission the following claims long since barred (more than 18 years) by limitations:

1. Claims on behalf of the Yanktonais who were not parties to the 1851 Treaty or the 1868 Treaty, or plaintiffs in person or in a representative capacity in the original petition of the Tetons.

2. Claims for the 14.3 million acres occupied by the Yanktonais east of the Missouri River.

3. Claims based on *aboriginal title* to land on both the east and west sides of the Missouri River. (The original petition alleged claims based *only on recognized* title.)

4. Claims based on alleged wrongful takings under the Treaty of 1868.

5. Claims to Royce Area 410 east of the Missouri River occupied by the Yankton Tribe.

6. Claims by the Tetons to an interest in the 14.3 million acres occupied by the Yanktonais *east* of the Missouri River based on *aboriginal* Indian title.

7. All other claims not contained in the original petition of 1950 of the Tetons.

The order of the Commission allowing the Tetons to intervene in Docket 332A of the Yanktons to assert a claim to Royce Area 410 is directly contrary to our recent decision in United States v. Kiowa, Comanche & Apache Tribes, 479 F.2d 1369, 202 Ct.Cl. 29 (1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1936, 40 L. Ed.2d 287 (1974), in which we held that where a tribe of Indians timely files a claim for compensation for a wrongful taking of its property by the Government, another tribe which did not file its claim within the limitation period for a wrongful taking will not be allowed to intervene in the suit of the tribe which timely filed its claim, if the intervening tribe's claim is adverse to the claim of the tribe that filed its claim within the limitation period. That decision bars the claim in intervention of the Tetons in the Yankton suit (Docket 332A) in this case because the Yankton suit was timely filed as to Royce Area 410, but the plea in intervention of the Tetons was barred by limitations and was adverse to the claim of the Yanktons to Royce Area 410. Consequently, the allowance of the plea in intervention of the Tetons in Docket 332A was improper. Therefore, the claims of the Tetons under the Treaty of 1868 and the other claims of the Tetons listed above that were barred by limitations were improperly allowed to be filed by the Commission in such plea in intervention.

When the Commission allowed the Tetons to intervene in Docket 332A of the Yanktons with reference to Royce Area 410, it consolidated Docket 332A (now Docket 332C) with Docket 74 of the Tetons. Therefore, in 1969, the Yanktons filed a pleading asserting for the first time a claim to land west and south of the Missouri River on the ground that they were a party to the 1851 Treaty. The Commission allowed this pleading to be filed and has allowed the Yanktons to recover an interest in such land. This was error, because, under the decision of

this court in the above-cited Kiowa, Comanche & Apache case, the Yanktons, whose claim to land west and south of the Missouri River had been barred by limitations for more than 18 years, could not assert those claims for the first time in a suit timely filed by the Tetons (under the Treaty of 1877) when those claims were adverse to those of the Tetons. Consequently, any award to the Yanktons of an interest in land west and south of the Missouri River is improper and the claim thereto is barred by limitations.

One of the most glaring errors in this case by the Commission and the majority is the award of 14.3 million acres east of the Missouri River to the Tetons and Yanktonais based on aboriginal title. This is true for the following reasons:

1. The Yanktonais were not parties to the Treaties of 1851 or 1868.
2. The Yanktonais were not parties plaintiff in the original petition in this case by name or in a representative capacity, and are not now and never have been a party to this suit.
3. The Treaty of 1851 covered only land west of the Missouri River.
4. The Treaty of 1868 covered only land west of the Missouri River and along the east bank of the river.
5. The original petition in this case claimed a wrongful taking of land west of the Missouri River only.
6. The original petition claimed compensation for wrongful taking of land owned by recognized title only.
7. All of the above claims were barred by limitations by more than 18 years.

It is understandable why the Tetons included a claim on behalf of the Yanktonais to the 14.3 million acres east of the Missouri River in their plea in intervention in the Yankton suit (Docket 332C) in 1969. This was the only way the Tetons could add the 14.3 million acres to their recovery in this case, be-

cause the Tetons did not occupy this area and the Yanktonais were not parties in the original petition, and were a separate tribe. They seek to justify this recovery by some kind of a nebulous ancestral relationship with the Yanktonais, notwithstanding the fact that the Commission found that they were separate tribes. It is clear that the Yanktonais occupied this 14.3 million acre tract, but they have no right to recover it in this case for all of the reasons set forth above.

The decision of the Commission and the majority in this case is in conflict with the opinion in McGhee ex rel. Creek Nation East of the Mississippi v. United States, 437 F.2d 995, 999, 194 Ct. Cl. 86, 92 (1971), in which the plaintiffs attempted to expand their original petition and the court said:

The Commission found, correctly in our opinion, that "not only the quantum of relief varies, so does the theory of recovery, so does the property upon which the claim of relief is founded. In fact, all varies save only the parties plaintiff." * * *

The foregoing is true in the instant case as to quantum of relief, theory of recovery, property claimed, and *also as to parties plaintiff*. As to quantum of relief, there can be no doubt that the amount claimed here is vastly in excess of that claimed in the original petition of the Tetons; the property claimed is on the east and west and south sides of the Missouri River instead of west and south of the river as claimed in the original petition; the theory of recovery here is based on an alleged wrongful taking under the Treaty of 1868 instead of on the Act of 1877, and is also based on both recognized and aboriginal title, whereas the original petition contained claims based only on the Act of 1877 and on recognized title; and the parties plaintiff vary in that the Tetons were the only plaintiffs in the original petition and now we have, in addition, the Yanktons (as to land west and south of the Missouri River) and the Yanktonais (as to lands east, south, and west of the Missouri).

It should be pointed out that the Commission segregated the claims of the Tetons to the 7,345,157 acres in the Black Hills area so that the claim for that area is pending before the Commission as Docket 74A. That claim is not before us in this suit. The instant suit is Docket 74 that is consolidated with the Yankton Docket 332C (for Royce Area 410). This is mentioned to show the vastness and enormity of the claims of the plaintiffs. This is no ordinary suit. The decisions of the Commission and the majority, if allowed to stand, will result in awarding the plaintiffs at least 75 or 80 million acres of land, plus 7 or 8 million acres more in Royce Area 410. Recovery for the 7,345,157 acres in Black Hills remains to be litigated, and if the plaintiffs prevail in that claim, the total recovery will stagger one's imagination.

When it is considered that all of the claims in the present suit, except those of the Yanktons to Royce Area 410, are barred by limitations, the decision of the Commission as to the remainder appears to be an enormous grant or gift by the Commission to the plaintiff Indian Tribes, and makes a mockery of the statute of limitations. The power and authority to make such a grant or gift is reserved to Congress and is not vested in the Commission. If the Indians involved in this case are in need of assistance, as they claim, it is up to Congress and not the Commission, to grant them whatever is necessary to take care of their needs.

I would affirm that part of the Commission's decision awarding the described portion of Royce 410 to the Yanktons and denying to all plaintiffs the described portion in the northeastern and northwestern corners of Royce 410, and would reverse the decision of the Commission allowing recovery to the Tetons, the Yanktonais and the Yanktons with reference to all of the other claims, because they are barred by the statute of limitations, and would dismiss plaintiff's suit as to those claims.